Walter J. LANGDON and Evelyn A. Langdon, Appellants,

v.

UNITED RESTAURANTS, INC. d/b/a Stanford & Sons Restaurant & Comedy House, Respondent.

No. WD 60707.

Missouri Court of Appeals, Western District.

May 30, 2003.

---

Thomas. E. Thompson, Dennis Owens, Kansas City, MO, for Appellants.

Thomas R. Buchanan, Kansas City, MO, for Respondent.

Before SMITH, P.J., LOWENSTEIN and HARDWICK, JJ.

LISA WHITE HARDWICK, Judge.

Walter and Evelyn Langdon appeal from the trial court's judgment denying their claims for rent and possession and unlawful detainer against United Restaurants, Inc. The Langdons contend: 1) the court erroneously interpreted the percentage rent provision in the parties' commercial lease agreement; and 2) the evidence is insufficient to prove the Langdons waived and were estopped from claiming any breach by United. We affirm the trial court's judgment.

## Factual and Procedural History

Walter and Evelyn Langdon own commercial property located at 504 Westport Road in Kansas City. During the 1970's and 1980's, the Langdons leased the property to a tenant who operated a restaurant and bar, known as Stanford & Sons, from that location.

In 1990, the Langdons agreed to lease the property to United Restaurants, Inc. for continued operation of Stanford & Sons. On March 13, 1991, the parties executed a lease agreement that established a fixed minimum monthly rental for the premises for five years. In addition to the fixed rental fee, the lease provided that United would pay the Langdons percentage rent in "a sum equal to six (6) percent of the annual gross receipts, as hereafter provided, in excess of the sum of One Million Dollars ($1,000,000)." The term "annual gross receipts" was defined in the lease as: "receipts from gross sales of [United] and of all licensees, concessionaires and tenants of [United], from all businesses conducted upon or from the leased premises by [United]." The lease required United to pay the percentage rent within thirty days after each lease

year. The lease also obligated United to provide the Langdons with annual financial statements within thirty days after each calendar year. United had options to extend the lease for three additional five-year terms.

In 1993, United leased additional space at 508 Westport Road, located in the Manor Square shopping mall and adjacent to the Langdon's property. The new space, leased from Manor Square, was used as a dance hall and dining club. United constructed a hallway to connect the new space with the Stanford & Sons restaurant/bar. Patrons could access the dance hall from both the Manor Square mall and restaurant. Food served in the dining club was generally prepared in the restaurant's main kitchen located at 504 Westport Road.

Approximately one year later, United leased additional space at Manor Square and opened a billiards room. A second entrance was opened to connect the billiards room to the Stanford & Sons restaurant at 504 Westport Road. In 1996, United leased a third space in Manor Square. The billiards room was moved to that space, and United opened a comedy club where the billiards room had been located. Patrons were able to access the comedy club from both the Manor Square mall and the Stanford & Sons restaurant. The comedy club had its own ticket window, separate bar, and a small kitchen, but much of the food was prepared in the main kitchen at 504 Westport Road.

All three of the Manor Square spaces were subject to separate leases, at least one of which included a percentage rent clause. United paid percentage rent to Manor Square pursuant to the lease for the comedy club space from March 1999 through February 2000.

With regard to the restaurant property at 504 Westport Road, United exercised options to extend its five-year lease with the Langdons in 1996 and 2001. No percentage rent was ever paid by United under the original or extended lease agreements. United also did not provide annual financial statements until the Langdon's son, Tom Langdon, took over management of the lease in 1997 and requested such records in order to have the property appraised. In response, United produced financial records for 1994 through 1997, showing that its total annual revenues for the restaurant/bar, dance hall, dining club, billiards room, and comedy club exceeded $1,000,000 in each of those three years.[1]

In May 2000, the Langdons filed a petition against United for "Rent and Possession Action and Unlawful Detainer" in Jackson County Circuit Court. The petition alleged United breached the lease agreement by: (1) failing to pay the percentage rental; (2) failing to provide annual financial statements; and (3) making unauthorized alterations to the leased property. As a result of these breaches, the Langdons alleged United unlawfully held the property at 504 Westport Road. The Langdons sought possession of the premises and damages for rent and repair.

Following a two-day bench trial, the court entered judgment in favor of United and against the Langdons on their petition. The court determined that no percentage rent was due under the lease agreement because United's gross receipts solely from the restaurant/bar business conducted at 504 Westport Road did not

---

1. The records established that United's total annual revenues during 1994–1997 for all of its businesses located at 504 Westport Road and in Manor Square were as follows: 1994—$1,089,193; 1995—$1,004,663; 1996—$1,054,145; 1997—$1,435,500.

exceed $1,000,000 in any year.[2] The court also found the Langdons took no enforcement action in response to United's failure to provide financial statements from 1991–1996 and thereby waived that contractual requirement. Similarly, the court found that the Langdons waived, through inaction, a provision in the lease prohibiting United from altering the property without the lessor's consent. Based on these waivers, the court held the Langdons were estopped from seeking to declare United in breach of the lease agreement.

## Points on Appeal

The Langdons raise two points on appeal. First, they contend the trial court erroneously interpreted the lease agreement in finding that United's percentage rent was to be based solely on the gross receipts of the restaurant/bar business located at 504 Westport Road. Second, Appellants contend the evidence is insufficient to support the court's determination of waiver and estoppel on the unlawful detainer claim.

In reviewing this court-tried case, we must affirm the judgment unless there is no substantial evidence to support it, it is against the weight of the evidence, or it erroneously declares or applies the law. *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976). We must defer to the trial court's factual determinations, reviewing the evidence in a light most favorable to the judgment and disregarding all contrary evidence. *King v. City of Independence*, 64 S.W.3d 335, 338 (Mo.App. W.D. 2002). Questions of law, however, are reserved for the independent judgment of the appellate court without deference to the trial court's determination. *Craven v. State ex rel. Premium Standard Farms, Inc.*, 19 S.W.3d 160, 163 (Mo.App. W.D. 2000).

## Interpretation of Lease Agreements

The Langdons contend the trial court erroneously applied the law of contract by interpreting the lease agreement to require that United pay percentage rent solely based on the gross receipts of the Stanford & Sons restaurant/bar business conducted at 504 Westport Road. Appellants argue the court ignored the plain language of the lease terms—"business conducted on or from the leased premises"—and refused to give effect to the parties' intent that percentage rent would be based upon earnings *from* the leased premises even if the earnings were not generated *on* the premises.

In rendering judgment against the Langdons, the trial court determined "the provisions of the Lease pertaining to percentage rent are subject to more than one interpretation, and are vague and ambiguous." The court therefore considered extrinsic evidence to determine the intent of the parties and made the following findings:

> At the time the lease herein was drafted, [the Langdons] were aware that the previous tenant, Stanford Glazer had expanded and connected his business to the premises in Manor Square. [The Langdons], therefore, were in a superior position to anticipate that a tenant at 504 Westport Road could expand its

---

**2.** At trial, United presented expert testimony from a certified public accountant who analyzed the gross receipts for each of United's separately leased locations. The expert testified that, during the relevant period, each location accounted for the following percentages of United's total gross receipts: the com-

edy club, 54.45%; the dance hall, dining club, and billiards room, collectively 12.60%; and the restaurant and bar at 504 Westport Road, 32.95%. The expert further testified that the gross receipts for United's restaurant and bar business at 504 Westport Road never exceeded $1,000,000 in any one year.

business to the adjoining location(s) at Manor Square, and, had they intended to share in the revenue derived from the adjoining premises, could have so stated with specificity. To adopt a different interpretation of the lease would construe the ambiguity in favor of [the Langdons], who drafted the agreement, and would essentially remake the Lease to give [the Langdons] a better bargain than they had contemplated.

As discussed herein, we find no error in the trial court's application of the law of contract to the facts of this case.

The interpretation of a lease agreement is a question of law, to which the general rules of contract construction apply. *Sonoma Mgmt. Co. v. Boessen,* 70 S.W.3d 475, 479 (Mo.App. W.D.2002); *Wetherbee, Ltd. v. Allred,* 969 S.W.2d 756, 758 (Mo.App. W.D.1998). The cardinal rule of contract interpretation is to ascertain the parties' intention and to give effect to that intention. *Sonoma,* 70 S.W.3d at 479. The intent of the parties is to be based upon the terms of the contract alone and not on extrinsic evidence unless the contract language is ambiguous. *Id.* An ambiguity arises only if the terms are reasonably open to more than one meaning, or the meaning of the language is uncertain. *Id.* Mere disagreement between the parties does not render contractual terms ambiguous. *Id.* Rather, the test is whether the disputed language, in the context of the entire agreement, is reasonably susceptible to more than one construction when the words are given their plain and ordinary meaning. *Blackman v. Blackman,* 767 S.W.2d 54, 59 (Mo.App. W.D. 1989). If a court determines a contract is ambiguous, the resolution of the ambiguity becomes a factual determination entitled to deference by the appellate court. *Id.*

We must apply these rules of construction to interpret the percentage rent provisions in the subject lease agreement. The lease provides that United will pay 6% of its "annual gross receipts" to the Langdons as percentage rent. The lease defines gross receipts as "receipts from gross sales of [United] and of all licensees, concessionaires and tenants of [United], from *all business conducted upon or from the leased premises* by [United] ..." (emphasis added). There is no dispute that the term "leased premises" refers to the Langdons' property located at 504 Westport Road. There is also no dispute that the phrase "business conducted *upon* ... the leased premises" refers solely to United's restaurant/bar operations at 504 Westport Road. The Langdons argue, however, that the language "business conducted ... *from* the leased premises" must be interpreted to include the dance club, dining club, billiards room, and comedy club, all of which was an outgrowth of the restaurant business and are largely provided food services from the restaurant's main kitchen. United responds that the lease language is, at best, ambiguous because it does not clearly indicate any intention by the parties to base the percentage rent on related business activities occurring on property adjacent to the leased premises.

The focus here is on the meaning of the term "from," which MERRIAM WEBSTER'S COLLEGIATE DICTIONARY, 477–78 (10th ed.2000) defines as a function word to indicate "a starting point of physical movement .... (e.g., came here from the city)" or "the source, cause agent, or basis (e.g., we conclude from this)." These definitions are of little benefit in resolving this dispute, as they can be alternatively used to support either party's interpretation of the lease agreement. As noted, the Langdons contend the restaurant is the originating and operational source of all of United's entertainment-related businesses and, thus, the dictionary definitions could sup-

port Appellants' broad interpretation of the disputed language. However, it is equally plausible for United to argue that the relevant starting point or source for business revenue is determined by the particular location patronized. If a customer enters the billiards room, dance hall, dining club, or comedy club, and purchases food or entertainment at those locations, the dictionary definition of the term "from" would also indicate that these receipts did not originate from the leased premises at 504 Westport Road.

The plausibility of these dual and conflicting interpretations gives rise to a legal ambiguity in the percentage rental clause of the lease agreement. *See Block v. N. Am. Sav. Bank, F.S.B.,* 59 S.W.3d 567, 573 (Mo.App. W.D.2001). We do not find any other language, in the context of the entire lease agreement, that clarifies the parties' intention regarding the percentage rent provisions. The trial court did not err in determining the provision is ambiguous as a matter of law. We therefore proceed to determine whether the court's resolution of the ambiguity in United's favor is supported by factual evidence in the record.

In light of the ambiguity regarding the percentage rent provision, the court could consider extrinsic evidence to determine the parties' intent. *Blackman,* 767 S.W.2d at 59. The court found that the Langdons drafted the lease agreement and could have clearly stated their intentions regarding the calculation of percentage rent. The Langdons were aware that their prior tenant had expanded the Stanford & Sons business into Manor Square. Based on their experience with the property and their opportunity to draft the lease terms with United, the court properly ruled that the Langdons were not entitled to benefit from the ambiguity they created in the lease agreement. *Disabled Veterans Trust v. Porterfield Constr., Inc.,* 996 S.W.2d 548, 552 (Mo.App. W.D.1999).

In further support of its findings that the percentage rent provision applied only to business conducted at 504 Westport Road, the court found the following facts indicative of the parties' intent:

Neither party presented any evidence that in 1991, when the Lease was executed, [United] contemplated expanding its business in any way. In fact, the evidence indicated that the business climate in Westport entertainment district in 1991 was precarious, and that some establishments in the area had gone out of business. [The Langdons] specifically had experienced with ..., a previous tenant at 504 Westport Road, who went out of business. The primary concern of all parties at the time of Lease execution was that [United] operate a successful business at 504 Westport Road.

* * *

... [The Langdons'] representative, Tom Langdon, specifically distanced [the Langdons'] property from the properties in Manor Square in a dispute over the use of insurance proceeds from the fire of March, 1998. Tom Langdon, writing on behalf of [the Langdons], specifically sought to ensure that the insurance proceeds from that fire would be used *only* for the property at 504 Westport Road and *not* for any space in Manor Square.

* * *

Furthermore, [United's] restaurant and bar at 504 Westport Road and its Comedy Club at Manor Square are sufficiently distinct so as not to be dependent on the other for its existence. Indeed, the restaurant and bar survived prior to the opening of the Comedy Club. The Comedy Club is a separate attraction with a different theme. The

Comedy Club derives the overwhelming majority of its income from admissions and liquor sales, which occur at Manor Square. The Comedy Club has its own ticket window, its own bar, its own liquor storage, and a small kitchen at the space leased in Manor Square. The Comedy Club can, and for the most part does, operate independent of restaurant and bar at 504 Westport Road.

\* \* \*

Finally, to interpret this Lease to mean that [United] could be liable to [the Langdons] for a percentage of its gross revenue (in excess of $1 million) derived from all locations is unreasonable. [United] is subject to separate leases for each of its separate spaces, and such an interpretation could result in [United] being responsible for percentage rent on the same gross revenue to multiple landlords.

On appeal, the Langdons only dispute the relevance of the parties' disagreement over the fire insurance proceeds and the reasonableness of the court's conclusion that the comedy club operated as a business distinct from the restaurant/bar. We note, however, that testimony in the record supports the court's findings and conclusions in this regard, and we must defer to the factfinder's determination that this evidence weighed in favor of United's interpretation of the lease agreement. Point I is denied.

### Evidence of Waiver and Estoppel

 In Point II, the Langdons contend the evidence was insufficient to prove United's affirmative defenses of waiver and estoppel. This argument relates to the court's determination that the Langdons were not entitled to relief under the Count II claim of unlawful detainer because they waived their right to receive annual financial statements from United and were thereby estopped from claiming United breached that provision.

Under Article III, paragraph 2 of the lease, United had a duty to produce its annual financial statements "including a balance sheet and an income statement, prepared in accordance with generally accepted accounting principles ... within thirty (30) days after the end of each calendar year...." For the years 1991 through 1996, United did not provide those financial records, and the Langdons did not request production or take any action to enforce this provision.

Because the lease affirmatively obligated United to produce its financial records without a formal request, the Langdons contend their right to have such documentation could only be waived by an explicit waiver, *Brown v. State Farm Mut. Auto. Ins. Co.*, 776 S.W.2d 384, 388 (Mo.banc 1989), or some affirmative, unequivocal, decisive act indicating their intent to waive with no other explanation possible. *Waterwiese v. KBA Constr. Managers., Inc.*, 820 S.W.2d 579, 585 (Mo.App. E.D.1991). They argue their failure to enforce the lease provision requiring disclosure was forbearance and not a clear waiver; an intent to retain their rights while refraining from enforcement. *Kroh Bros. Dev. Co. v. State Line Eighty–Nine, Inc.*, 506 S.W.2d 4, 12 (Mo.App. W.D.1974). Appellants assert their inaction was not grounds for estoppel because they had no duty to speak or act under the terms of the lease agreement.

 The authorities cited, all of which address waiver in the context of disputes over insurance contracts or promissory notes, are not instructive in this action for unlawful detainer. To invoke

the harsh remedy of unlawful detainer,[3] a landlord is held to scrupulous observance of every element of the common law action of forfeiture, unless waived by agreement. *Fritts v. Cloud Oak Flooring Co.,* 478 S.W.2d 8, 11–12 (Mo.App. S.D.1972). The landlord must provide notice of forfeiture and demand compliance with the lease terms. *Id.* n. 5 (addressing non-payment of rent). Courts do not favor forfeitures and may rest on evidence of waiver or estoppel to avoid forfeiting the lease. *Id.* at 12. Performance of certain lease terms may be waived when a landlord, by expression or conduct, leads the tenant to believe strict compliance is not required. *Id.* Such belief may be reasonable when induced by the landlord's continued acceptance of rent payments without the notifying tenant that non-compliance with the lease terms will result in forfeiture. *Id.*

The Langdons accepted rent payments from 1991 through 1996 without ever objecting to United's failure to produce annual financial statements. This conduct over a six-year period indicated the landlord's willingness to affirm the lease and not insist upon strict compliance with the records production requirement. A similar situation arose in *Independence Flying Service, Inc. v. Abitz,* 386 S.W.2d 399 (Mo. 1965), where the Supreme Court found a landlord waived its right to declare forfeiture based upon a tenant's violation of a sublease provision. The Court held that by accepting rent with knowledge of the sublease violation and failing to promptly assert forfeiture, the landlord thereby affirmed the lease and assured the tenant that possession of the property would not be disturbed. *Id.* at 405.

Whether a landlord has waived a right to declare forfeiture of a lease is a factual determination best left to the judg-

ment of the trial court. *Lucas Hunt Village Co. v. Klein,* 358 Mo. 1054, 218 S.W.2d 595, 600 (1949). Here, we must affirm the judgment based on substantial evidence that the Langdons waived their right to production of United's financial statements for six years and were thereby estopped from asserting any breach to forfeit the lease agreement. Point II is denied.

The judgment of the trial court is affirmed.

All concur.

---

**3.** Remedies for unlawful detainer include double rent payments and double damages, as well as eviction from the property. § 534.330 RSMO 2000.