Corrected Opinion
May 1, 2014



# In the Missouri Court of Appeals
## Western District

| | | |
|---|---|---|
| STAR DEVELOPMENT CORPORATION, | ) | |
| Respondent, | ) | |
| v. | ) | WD76619 |
| | ) | FILED: April 29, 2014 |
| URGENT CARE ASSOCIATES, INC., et al, | ) | |
| | ) | |
| Appellant. | ) | |

## APPEAL FROM THE CIRCUIT COURT OF CLAY COUNTY
### THE HONORABLE JANET L. SUTTON, JUDGE

### BEFORE DIVISION FOUR: JAMES E. WELSH, CHIEF JUDGE, PRESIDING,
### LISA WHITE HARDWICK, JUDGE AND GERALD D. MCBETH, SPECIAL JUDGE

Urgent Care Associates, Inc., d/b/a Liberty Urgent Care ("Urgent Care"), and its owner and operator, David Ochs, D.O., appeal the circuit court's judgment awarding damages and attorneys' fees to Star Development Corporation ("SDC") based upon the parties' lease agreement. Urgent Care and Ochs contend the circuit court erred in: (1) ordering them to pay late charges; (2) finding that Urgent Care was required to give SDC a thirty-day written notice of termination of its month-to-month tenancy; and (3) awarding SDC attorney's fees. For reasons explained herein, we affirm the circuit court's judgment. Furthermore, we sustain SDC's motion for attorney's fees on appeal and remand the case to the circuit court for a hearing to determine the reasonableness of the amount requested.

**FACTUAL AND PROCEDURAL HISTORY**

SDC is a commercial leasing company that owns many properties and leases commercial space to numerous tenants. Tim Harris is the president of SDC. One of the commercial properties that SDC owns and operates is the Liberty Landing Shopping Center ("Liberty Landing").

In December 2003, Urgent Care entered into a commercial lease agreement with SDC for space in Liberty Landing. Ochs signed a guaranty on the lease. Pursuant to the lease's terms, Urgent Care was to pay rent to SDC each month, plus its proportionate share of estimated common area maintenance ("CAM") fees, insurance, and taxes. Within a reasonable time after the end of each calendar year, SDC was to calculate Urgent Care's share of the actual CAM fees, insurance, and taxes. If the actual allocable expenses were more than the estimated allocable expenses, then Urgent Care was required to pay the difference. Conversely, if the actual allocable expenses were less than the estimated allocable expenses, then Urgent Care was entitled to a credit. The lease was to expire on December 31, 2007, but it included two options to extend, each for three-year terms. In 2007, Urgent Care exercised its option to extend the lease to December 31, 2010.

On December 17, 2010, Harris and Sheryl Giambalvo, a broker for SDC, met with Ochs. During this meeting, Ochs expressed an interest in expanding Urgent Care's space in Liberty Landing. Ochs was unsure at that time, however, if he wanted to extend the lease for another three-year term. Consequently, the parties agreed that, when the lease expired on December 31, 2010, Urgent Care would become a month-to-

2

month tenant, under the same rate and terms as the lease.[1]  Ochs did not give notice at that time that Urgent Care would be vacating the premises.

After the December 2010 meeting, Giambalvo immediately contacted the tenant adjacent to Urgent Care to determine if that tenant would relinquish some of its space to Urgent Care.  She then attempted to contact Ochs to discuss the possible expansion with him, but he never returned her call.  There were no further meetings between SDC and Ochs.

In March 2011, Giambalvo was driving to lunch and saw Urgent Care's sign on another location in Liberty.  She called Urgent Care, and the receptionist told her Urgent Care had moved.  This was the first time that SDC became aware that Urgent Care was vacating the leased space in Liberty Landing, as SDC had not received any notice from Ochs or anyone else at Urgent Care.  It was SDC's practice and policy to market leased space once it was notified that the space was to become available.  This marketing was done immediately, through signs, showings of the space, and notifications to other brokers of the space's availability.  SDC had not marketed Urgent Care's leased space in Liberty Landing between January 2011 and March 2011 because it had not received notice of Urgent Care's plans to vacate.

Urgent Care surrendered the keys to the leased space to SDC on April 4, 2011.  On April 7, 2011, Urgent Care gave written notice to SDC that it was vacating the leased space.

On October 20, 2011, SDC filed a petition for damages against Urgent Care and Ochs.  It amended the petition on September 25, 2012.  In Count I of the amended

---

[1] Article 28 of the lease provided that, if Urgent Care remained in possession of the property after expiration of the lease without a new written and executed lease, then Urgent Care would become a month-to-month tenant and would be "subject to all covenants, conditions and agreements of this Lease."

3

petition, SDC sought damages for rent, CAM fees, insurance, taxes, and late charges that it claimed Urgent Care owed.  In Count II, SDC sought attorney's fees under the lease agreement.[2]  Urgent Care and Ochs filed counterclaims for an accounting and breach of contract.  Urgent Care also sought attorney's fees and costs.

Following a bench trial, the court found that:  (1) because Urgent Care did not provide written notice to SDC that it was vacating the premises until April 7, 2011, Urgent Care and Ochs owed rent and late charges for April and May 2011 in the amount of $4,018.67; (2) Urgent Care and Ochs owed a total of $19,122 in late charges on 39 rental payments made between 2006 and 2010 because those payments were not made by the tenth of the month; (3) even though SDC sold a portion of Liberty Landing in 2007, Urgent Care's allocable percentage of CAM fees, insurance, and taxes did not increase but remained the percentage stated in the lease; (4) Urgent Care and Ochs owed SDC $3,213.78 in CAM fees, insurance, and taxes for 2010 and January through May 2011; (5) under the lease, SDC was entitled to reasonable attorney's fees and costs in the amount of $12,465.60 from Urgent Care and Ochs; and (6) Urgent Care and Ochs did not present any evidence to support their counterclaims. Accordingly, the court entered judgment in favor of SDC and against Urgent Care and Ochs on all claims except SDC's claim for adjusted CAM fees for 2008 and 2009. Urgent Care and Ochs appeal.

## STANDARD OF REVIEW

We will affirm the circuit court's judgment unless there is no substantial evidence to support it, it is against the weight of the evidence, it erroneously declares the law, or it erroneously applies the law.  *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976).

---

[2] SDC's petition contained a third count, but SDC dismissed this count before trial.

We view the evidence and inferences therefrom in the light most favorable to the court's judgment and disregard all contrary evidence and inferences. *Cowbell, LLC v. Borc Bldg. & Leasing Corp.*, 328 S.W.3d 399, 404 (Mo. App. 2010). We defer to the court's determination of the witnesses' credibility and the weight to be given their testimony. *Underwood v. Hash*, 67 S.W.3d 770, 774 (Mo. App. 2002). The circuit court was "free to accept or reject all, part, or none of the testimony of any witness." *Maskill v. Cummins*, 397 S.W.3d 27, 34 (Mo. App. 2013).

## ANALYSIS

Urgent Care and Ochs's first three points on appeal challenge the circuit court's award of late charges on 39 rental payments Urgent Care made between 2006 and 2010, for a total of $19,122. Article 3 of the lease required Urgent Care to make monthly rental payments "in advance upon the first day of each and every month during the term." Article 3(c) of the lease required Urgent Care to pay a late charge equal to 15% of any rental payment not made by the tenth of the month:

> Late Charges: Tenant acknowledges that Landlord shall be required to expend certain administrative efforts in the event Tenant shall fail to timely remit payments due under the terms of this Lease. Accordingly, and in addition to interest which Tenant may be required to pay Landlord on late remittances (but without waiving Landlord's right to treat such late remittances as a default on or a breach of this lease), Tenant agrees to pay Landlord a late charge of fifteen percent (15%) of any remittance which is not made within (10) days after the due date for such remittance.

In Points I and II, Urgent Care and Ochs contend the court erred in awarding SDC late charges because SDC failed to present sufficient evidence establishing that the late charge provision was a liquidated damages clause and not a penalty clause.

5

Generally, liquidated damages clauses in contracts are enforceable, while penalty clauses are not. *Paragon Group, Inc. v. Ampleman*, 878 S.W.2d 878, 880 (Mo. App. 1994). This is because "the objective behind contractual remedies is to effect a compensatory award, not to provide a penalty for the breach of an agreement." *Luna v. Smith*, 861 S.W.2d 775, 779 (Mo. App. 1993). "Liquidated damages are a measure of compensation which, at the time of contracting, the parties agree shall represent damages in case of breach." *Paragon*, 878 S.W.2d at 880. In contrast, penalty clauses serve as punishment for a default or breach. *Diffley v. Royal Papers, Inc.*, 948 S.W.2d 244, 246 (Mo. App. 1997).

Missouri has adopted the Restatement of Contracts rules to aid in determining whether a damages clause is an enforceable liquidated damages clause or an unenforceable penalty provision. *Luna*, 861 S.W.2d at 779. To be a liquidated damages clause: "(1) the amount fixed as damages must be a reasonable forecast for the harm caused by the breach; and (2) the harm must be of a kind difficult to accurately estimate." *Paragon*, 878 S.W.2d at 881 (citing RESTATEMENT (SECOND) OF CONTRACTS § 356 (1979)). Additionally, the non-breaching party must show some actual harm. *Goldberg v. Charlie's Chevrolet, Inc.*, 672 S.W.2d 177, 179 (Mo. App. 1984). "While this need not be a precise dollar amount, it nevertheless must be shown that some harm or damage, in fact, occurred" to trigger the liquidated damages clause. *Id.*; *Paragon*, 878 S.W.2d at 881.

As with any contract, "the intention of the parties in each case governs the construction." *Wilt v. Waterfield*, 273 S.W.2d 290, 295 (Mo. 1954). Thus, in deciding "whether an agreement sets forth a penalty or liquidated damages, we look to the

intention of the parties as ascertained from the contract as a whole." *Diffley*, 948 S.W.2d at 246. "The provision must be fixed on the basis of compensation, otherwise it is construed as a penalty clause designed primarily to compel performance." *Id.* at 247. "While the label the parties attach to a provision is not conclusive, it is a circumstance to be considered when deciding whether the provision is to be considered liquidated damages or a penalty." *Id.*

In this case, the express language of the lease's late charge provision indicated that the late charge was intended to compensate SDC for the administrative expenses it would incur if Urgent Care failed to pay the rent on time. Urgent Care and Ochs argue that, despite the lease's language, Harris's and Giambalvo's testimony showed that SDC actually intended the provision to be a penalty, designed to compel performance and change tenants' behavior. Urgent Care and Ochs note that, when asked what the purpose of the late fee provision was, Harris testified that the purpose was to get tenants to pay on time so that SDC would not have to "chase them." Similarly, Giambalvo testified that the late fee provision's purpose was to get tenants to pay on time so that SDC would not have to "collect rent."

The circuit court was not required to accept and rely upon this testimony as determinative of the parties' intent. See *Maskill*, 397 S.W.3d at 34. When evaluating the enforceability of a liquidated damages provision, courts are to consider the parties' intent at the time the contract was made, not at the time the contract was breached. Harry F. Luepke III, *How to Draft and Enforce a Liquidated Damages Clause*, 61 J. Mo. B. 324, 326 (2005). Giambalvo was not working for SDC at the time the lease was made, so her testimony regarding the intent of the late fee provision was irrelevant. The

late charge provision in the lease clearly and unambiguously stated that the late charge was intended to be compensatory. "Unambiguous language in a lease is evidence of the parties' intent." *Brittany Sobery Family Ltd. P'ship v. Coinmach Corp.*, 392 S.W.3d 46, 50 (Mo. App. 2013). Because the language of the late charge provision was unambiguous, the court properly relied on it -- and not non-contemporaneous parol evidence -- in determining that the parties intended the late charge to be compensatory rather than punitive at the time the lease was made. See *id.*

Nevertheless, Urgent Care and Ochs argue that the late charge was punitive in its operation because it was not a reasonable forecast of the damages SDC would incur upon Urgent Care's late remittances. They note that the provision assessed a flat 15% charge regardless of whether the payment was one day,[3] thirty days, or one year late, and they argue that there was no evidence that the charge, which amounted to $470 per late payment in 2006 and 2007 and $506 per late payment in 2008, 2009, and 2010, was reasonably related to any actual harm that SDC might suffer.

"By its nature, a liquidated damages clause may operate to provide the non-breaching party more or less than his actual damages." *Burst v. R.W. Beal & Co.*, 771 S.W.2d 87, 91-92 (Mo. App. 1989). To constitute a reasonable forecast of damages, a liquidated damages clause "'must not be unreasonably disproportionate to the amount of harm anticipated when the contract was made.'" *Paragon*, 878 S.W.2d at 881 (quoting *Burst*, 771 S.W.2d at 90). "'[T]he amount fixed is reasonable to the extent that it approximates the loss anticipated at the time of the making of the contract, even

---

[3] Urgent Care and Ochs characterize payments made on the 11th of the month as being "one day late" because they were made one day after the grace period expired. Rent was actually due on the first day of the month. Thus, while payments made on the 11th may have been only one day past the grace period, they were actually ten days late.

though it may not approximate the actual loss.'" *Id.* (quoting RESTATEMENT (SECOND) OF CONTRACTS § 356 cmt. b). "[T]he more difficult it is to forecast the amount of damages, the less proof there need be to show that the liquidated amount is a reasonable estimate of actual damages." Luepke, *supra*, at 325.

SDC offered testimony regarding the administrative efforts it expended to collect Urgent Care's late payments. Harris testified that, after the tenth of the month, SDC generated a report of tenants whose rent was past due, and he went over the report with his employees responsible for collecting rents. After he reviewed the report with his employees, the employees would begin trying to collect the past-due rent. Harris testified that Urgent Care was "late quite often." Harris's employee, Giambalvo, testified that she called Urgent Care regarding past-due rent. In addition to calling tenants after the tenth of the month, Giambalvo testified that she also called before the tenth in an attempt to get them to pay before they would incur the late charge. According to Giambalvo, she frequently had to call Urgent Care regarding late rental payments because Urgent Care was "consistently late."

Thus, for every month that Urgent Care was more than ten days late with a rental payment, SDC's employees generated a report, discussed Urgent Care's past-due status, and contacted Urgent Care regarding its past-due status. This was sufficient to establish that SDC suffered actual harm as a result of Urgent Care's late rental payments. That the lease provided a flat fee of 15% of the rental payment as compensation for this harm was not unreasonable. When the lease was made, the parties did not know how long Urgent Care would be past due on any late rental payments or the extent of the administrative efforts that SDC's employees would be

9

required to expend to collect Urgent Care's late payments. Depending upon those variables, SDC's actual harm could be less than, or significantly more than, the 15% late charge. Given the difficulty of estimating SDC's actual harm due to these unknown variables at the time the lease was made, the 15% late charge to which Urgent Care expressly agreed was a reasonable forecast of damages to compensate SDC for its administrative efforts.[4]

In Point III, Urgent Care and Ochs contend that SDC waived its right to collect the late charges through its course of conduct. They argue that, by accepting Urgent Care's late rental payments without notifying it that its payments were late or that it owed late charges and by failing to seek recovery of late charges on any of the 39 late rental payments over the course of the five-year lease period, SDC impliedly waived any right it had to collect the late charges.

"A waiver is an intentional relinquishment of a known right." *Austin v. Pickett*, 87 S.W.3d 343, 348 (Mo. App. 2002). "Where there is no express declaration of waiver, there must be a clear, unequivocal, and decisive act showing waiver implied by conduct." *Gordon v. Williams*, 986 S.W.2d 470, 473 (Mo. App. 1998). Indeed, "[t]he

_____

[4] Urgent Care and Ochs contend the late fee provision is similar to the late fee provision deemed an unenforceable penalty in *Diffley*, 948 S.W.2d at 246-47. In *Diffley*, the trustees of a pension plan imposed a 10% "late penalty" on employers who were delinquent in making monthly contributions to the plan. *Id.* at 245. On appeal, the court affirmed the circuit court's determination that the provision was unenforceable after finding that the provision was expressly termed a "late penalty," the 10% penalty was far more than the loss of market interest on the unpaid monthly contributions, and the harm caused was easily measurable in terms of loss of interest and the expense of administrative costs incurred in pursuing collection. *Id.* at 246-47. In this case, unlike in *Diffley*, the parties not only expressly labeled the late charge as compensation, but they also expressly agreed that the compensation was for the administrative efforts that SDC would be required to expend in the event of Urgent Care's untimely payments. "So long as the parties intended the fixed amount to compensate, rather than punish, the provision will be upheld regardless of the fact that the fixed amount turns out to be more than, or less than, the actual damages suffered." Luepke, *supra*, at 325 (citing *Arnett v. Keith*, 582 S.W.2d 363, 365-66 (Mo. App. 1979)). Moreover, while *Diffley* involved damages for the breach of a collective bargaining agreement, this case involves damages for breach of a lease. "Like real estate contracts, it is difficult to measure damages upon breach of a lease by the tenant." *Paragon*, 878 S.W.2d at 881.

implied waiver must be so indicative of an intention to waive that no other reasonable explanation is possible." *Id.*

Contrary to Urgent Care and Ochs's assertion, the evidence showed that SDC frequently notified Urgent Care that its payments were late. Ochs admitted that he recalled paying late on four occasions. Pursuant to the lease, Urgent Care's late rental payment automatically rendered it subject to the late charge. Article 3(c) provided that, in the event that Urgent Care failed to timely remit payment, Urgent Care agreed to pay SDC the 15% late charge. Because the lease did not require SDC to notify Urgent Care, either in writing or otherwise, that Urgent Care's late rental payments rendered it subject to late charges, SDC's failure to provide such notice was not a clear, unequivocal, and decisive act showing that it intended to waive its right to collect those charges.[5]

That SDC waited until after the litigation commenced to seek recovery of the late charges also did not constitute a clear waiver. Article 3(c) contained no time limit for SDC to assert its right to collect late charges on any of Urgent Care's late payments. Giambalvo testified that SDC tried to "work with the tenants the best we could" with regard to late rental payments and that SDC was not "trying to be adversarial" with its past-due tenants. "Forbearance is not waiver." *Kroh Bros. Dev. Co. v. State Line Eighty-Nine, Inc.*, 506 S.W.2d 4, 12 (Mo. App. 1974). Moreover, the lease contained a non-waiver clause. Article 27 stated:

---

[5] As part of their failure to notify claim, Urgent Care and Ochs note that SDC did not include the late charges on any of the five year-end reconciliation statements it sent to Urgent Care. Pursuant to Article 12(e) of the lease, the year-end reconciliation statements were for the amounts due for CAM fees after the periodic payments had been received throughout the year, not for rental payments or late charges for rental payments. Thus, SDC's failure to include the late charges on the year-end reconciliations was not a clear indication that it intended to waive its right to collect them.

11

The failure of Landlord to insist upon strict performance by Tenant of any of the covenants, conditions, provisions, rules and regulations, and agreements in this Lease, or Landlord's failure to exercise any option reserved to it hereunder, shall not be deemed a waiver of any of Landlord's rights or remedies and shall not be deemed a waiver of any subsequent breach or default by Tenant. No surrender of the Leased Premises shall be effected by Landlord's acceptance of rental or by any other means whatsoever unless the same be evidenced by Landlord's written acceptance of such as surrender. No payment by Tenant or receipt by Landlord of a lesser amount than the monthly rent and other charges hereunder shall be deemed to be other than on account of the earliest rent and other charges then unpaid nor shall any endorsement or statement or any check or any letter accompanying any check or payment as rent or other charges be deemed an accord and satisfaction, and Landlord may accept such check or payment without prejudice to Landlord's right to recover the balance of such rent or pursue any other remedy in this lease. No waiver by Landlord with respect to one tenant in the Shopping Center shall constitute a waiver in favor of Tenant.

Pursuant to Article 27's plain language, SDC's failure to exercise an option did not result in a waiver of its rights and remedies under the lease.[6] We find no express or implied act by SDC showing an intention to waive its right to collect late charges for Urgent Care's late rental payments. See *Gordon*, 986 S.W.2d at 473-74. Point III is denied.

In Point IV, Urgent Care and Ochs contend that the circuit court erred in holding that Section 441.060.4(1), RSMo 2000, required them to give SDC a thirty-day written notice of termination of its month-to-month tenancy. Section 441.060.4(1) provides, in pertinent part, that "the landlord or tenant may terminate a month-to-month tenancy by a written notice given to the other party stating that the tenancy shall terminate upon a periodic rent-paying date not less than one month after the receipt of the notice."

---

[6] Urgent Care and Ochs's reliance on *Langdon v. United Rests., Inc.*, 105 S.W.3d 882, 889-90 (Mo. App. 2003), and *Fritts v. Cloud Oak Flooring Co.*, 478 S.W.2d 8, 13-14 (Mo. App. 1972), for the proposition that the non-waiver clause can be disregarded in this case is misplaced. In those cases, unlike in this case, the landlord was asserting a forfeiture. *Langdon*, 105 S.W.3d at 890; *Fritts*, 478 S.W.2d at 13-14. Because forfeitures are disfavored in the law, the courts in those cases found that the landlord was required to give notice of the breach and demand compliance with the lease's terms before asserting the forfeiture, and its failure to do so resulted in a waiver of the forfeiture despite the lease's express non-waiver provision. *Langdon*, 105 S.W.3d at 889-90; *Fritts*, 478 S.W.2d at 13-14.

12

Urgent Care and Ochs argue that the word "may" in the statute indicates that the provision that the party terminating the tenancy give a thirty-day notice in writing is only permissive and is not required. We disagree.

Urgent Care and Ochs are correct that "[u]se of the word 'may' in a statute implies alternate possibilities and that the conferee of the power has discretion in the exercise of the power." *State ex rel. Nixon v. Boone*, 927 S.W.2d 892, 897 (Mo. App. 1996). The discretionary power conferred in Section 441.060.4(1), however, is the power to terminate the month-to-month tenancy, not the power to choose the method by which to terminate the month-to-month tenancy. If either the landlord or the tenant in a month-to-month tenancy decides to exercise its discretionary power to terminate, then Section 441.060.4(1) prescribes how the notice is to be given to the other party -- in writing and stating that the tenancy shall terminate upon a periodic rent-paying date not less than one month after receipt of the notice. To interpret Section 441.060.4(1) as giving the parties discretion as to *how* to terminate the month-to-month tenancy, *e.g.*, by written notice, by oral notice, or by no notice whatsoever, would essentially render the statute meaningless. We must presume that the legislature does not enact meaningless provisions or intend absurd results. *Berra v. Danter*, 299 S.W.3d 690, 696 (Mo. App. 2009).

The parties could have limited the statutory and common law notice requirements in the lease. *Gordon*, 986 S.W.2d at 473. They did not. The lease provided that, if Urgent Care remained in possession of the leased space after the lease expired, then Urgent Care would become a month-to-month tenant. As the lease did not specify the notice required to terminate the month-to-month tenancy and did not waive the statutory

13

or common law notice requirements, Section 441.060.4(1) provided the method by which either Urgent Care or SDC could terminate the tenancy if it chose to do so. Pursuant to Section 441.060.4(1), Urgent Care was required to give at least one month's written notice of its intention to terminate. *Davidson v. Kenney*, 971 S.W.2d 896, 898 (Mo. App. 1998); *Rauth v. Dennison*, 357 S.W.2d 201, 206-07 (Mo. App. 1962).

Urgent Care gave written notice it was terminating the month-to-month tenancy on April 7, 2011, after the start of the April monthly tenancy. The notice was not effective until May 7, 2011, after the May tenancy had commenced. *Davidson*, 971 S.W.2d at 898. Thus, the court did not err in finding that Urgent Care owed rent, CAM fees, insurance, taxes, and late fees for April and May 2011. Point IV is denied.

In Point V, Urgent Care and Ochs argue that, if we reverse the 2006-2010 late fees award, we should also reverse the award of $12,465.60 in attorney's fees due under the lease's attorney's fees provision.[7] We found no error in the late fees award. Therefore, Point V is denied.

Before submission of this case on appeal, SDC filed a motion for attorney's fees on appeal. This motion was taken with the case. In opposing the motion, Urgent Care and Ochs again assert that, because the 2006-2010 late fees award should be reversed, SDC is not entitled to attorney's fees. As we have affirmed the late fees award, we also grant the motion for attorney's fees on appeal.

---

[7] We reject Urgent Care and Ochs's argument that the late fees claim was the only claim of SDC's that arose from the lease and, therefore, was the only claim for which SDC was entitled to attorney's fees under the lease's attorney's fees provision. SDC's claim for rent, CAM fees, insurance, taxes, and late charges for April and May 2011 arose from the lease. The lease specifically stated that, after Urgent Care became a month-to-month tenant, it was still bound by the lease's "covenants, conditions and agreements," which included the payment of rent and fees.

While we have "the authority to allow and fix the amount of attorney's fees on appeal, we exercise this power with caution, believing in most cases that the trial court is better equipped to hear evidence and argument on this issue and determine the reasonableness of the fee requested." *Rosehill Gardens, Inc. v. Luttrell*, 67 S.W.3d 641, 648 (Mo. App. 2002). Accordingly, we remand the case to the circuit court to determine the reasonableness of the attorney's fees requested on appeal.

### CONCLUSION

The circuit court's judgment is affirmed. SDC's motion for attorney's fees on appeal is sustained, and the case is remanded to the circuit court for further proceedings consistent with this opinion.

_____
LISA WHITE HARDWICK, JUDGE

ALL CONCUR.