IN THE MISSOURI COURT OF APPEALS
 WESTERN DISTRICT
ADB COMPANIES, INC., )
 )
 Respondent, )
 )
v. ) WD83575
 )
SOCKET TELECOM, LLC, ) Opinion filed: February 9, 2021
 )
 Appellant. )

 APPEAL FROM THE CIRCUIT COURT OF BOONE COUNTY, MISSOURI
 THE HONORABLE KEVIN CRANE, JUDGE

 Division Two: W. Douglas Thomson, Presiding Judge,
 Lisa White Hardwick, Judge and Edward R. Ardini, Jr., Judge

 Socket Telecom, LLC (“Socket”) appeals the judgment entered by the Circuit Court of

Boone County, after a bench trial, in favor of Respondent ADB Companies, Inc. (“ADB”) on

ADB’s claim of breach of contract. The trial court found that Socket breached its contract with

ADB by improperly withholding funds owed to ADB and that, as a result, ADB was entitled to

attorney’s fees and prejudgment interest under section 431.180, RSMo.1 For the reasons stated

below, we reverse and remand with instructions to the trial court to enter judgment in favor of

Socket.

1
 All statutory references are to the Revised Statutes of Missouri 2016.
 Factual and Procedural Background

 Socket is an internet service provider. Socket obtained a “loan/grant” from the Rural Utility

Service (“RUS”), an agency within the United States Department of Agriculture, 2 to lay a fiber

optic network that would enable Socket to provide broadband internet service to homes and

businesses in Callaway County, Missouri. Socket did not “have its own crews that go out and lay

fiber,” so, using a structured process controlled by the RUS, it invited bids from subcontractors to

perform that work. ADB submitted a bid and was awarded the contract.

 On July 13, 2012, ADB3 and Socket entered into a contract wherein ADB was to place

“approximately 101 miles of fiber in the Fulton exchange in central Missouri” (the “Contract”).

The Contract required ADB to complete its work within “150 calendar days excluding Saturdays,

Sundays, and legal holidays from the contract commencement date,” however ADB was entitled

to an extension of this deadline for delays caused by Socket’s failure to provide necessary

materials, easements, or rights-of-way if ADB timely requested an extension in writing. The

Contract contained two provisions governing this deadline-extension procedure. The first

provision was located in the section of the Contract titled “Instructions to Bidders”:

 18. [Socket] represents:

 a) If by other provisions of the contract documents [Socket] shall have
 undertaken to furnish any materials for the construction of the Project, such
 materials are on hand . . . or if such materials are not on hand they will be
 made available by [Socket] to [ADB] before the time such materials are
 required for construction.
 b) That all items to be accomplished by [Socket] to facilitate construction have
 been accomplished or will be completed prior to construction activity.
 c) . . .

2
 The original mission of the RUS was to extend rural electrification; currently it provides funds to extend fiber optic
networks for internet access in rural areas.
3
 The parties to the contract were Socket and American Directional Boring, Inc. d/b/a ADB Utility Contractors.
American Directional Boring, Inc. was the previous legal name for Respondent ADB.

 2
 d) Easements and rights-of-way for the Construction Corridor used for the
 placement of buried cable have been obtained from property owners or
 public authorities. . . .
 e) . . .
 f) . . .
 g) . . .
 If [Socket] shall fail to comply with any of the undertakings contained in
 the foregoing representations or if any of such representations shall be
 incorrect, [ADB] will be entitled to extension of time of completion for a
 period equal to the delay, if any, caused by the failure of [Socket] to comply
 with such undertaking or by any such incorrect representation; provided
 [ADB] shall have promptly notified [Socket], in writing within ten (10)
 days, of its desire to extend the time of completion in accordance with the
 foregoing, and provided further that such extension, if any, of the time of
 completion shall be the sole remedy of [ADB] for [Socket’s] failure,
 because of conditions beyond the control and without the fault of [Socket],
 to furnish materials in accordance with subparagraph (a) hereof.

The second provision governing the deadline-extension procedure was located in Article II,

Section 1 of the Contract, titled “Time and Manner of Construction”:

 The time for Completion of Construction set forth in [ADB’s] Proposal shall be
 extended for the period of any reasonable delay which is due exclusively to causes
 beyond the control and without the fault of [ADB], including acts of God, fires,
 floods, inability to obtain materials, and acts or omissions of [Socket] with respect
 to matters for which [Socket] is solely responsible: Provided, however, that no such
 extension of time for completion shall be granted [ADB] unless within ten (10)
 days after the happening of any event relied upon by [ADB] for such an extension
 of time [ADB] shall have made a request therefore in writing to [Socket], and
 provided further, that no delay in such time of completion or in the progress of the
 work which results from any of the above causes except acts or omissions of
 [Socket] shall result in any liability on the part of [Socket].

(emphasis in original).

 Article VI, Section 2 of the Contract, titled “Liquidated Damages,” detailed the effect of

ADB’s failure to meet its deadline:

 The time of the Completion of the Construction of the Project is of the essence of
 this Contract. Should [ADB] neglect, refuse or fail to complete the construction
 within the time herein agreed upon, after giving effect to extensions of time, if any,
 herein provided, then in that event and in view of the difficulty of estimating with
 exactness damages caused by such delay, [Socket] shall have the right to deduct

 3
 from and retain out of such moneys which may be then due, or which become due
 and payable to [ADB] the sum of [$2,500.00] per day for each and every day that
 such construction is delayed in its completion beyond the specified time, as
 liquidated damages and not as a penalty; . . . Provided, however, that [Socket] shall
 promptly notify [ADB] in writing of the manner in which the amount retained,
 deducted, or claimed as liquidated damages was computed.

(emphasis in original). The “Completion of Construction” referred to in the liquidated damages

provision was contractually defined as “full performance by [ADB] of [its] obligations under the

Contract and all amendments and revisions thereof[.]” Pursuant to the Contract, “[t]he Certificate

of Completion, signed by the Engineer[4] and approved in writing by [Socket] and the

Administrator,[5] shall be the sole and conclusive evidence as to the date of Completion of

Construction[.]”

 Finally, as relevant to this appeal, the Contract contained a provision governing what the

parties refer to as “retainage,” located in Article III, Section 1 of the Contract, titled “Payments to

Contractor”:

 Within the first fifteen (15) days of each calendar month, [Socket] shall make
 partial payment to [ADB] for construction accomplished . . . . Only ninety-five
 percent (95%) of each such invoice approved during the construction of the project
 shall be paid by [Socket] to [ADB] prior to completion of the Contract. Upon
 completion by [ADB] of the construction of the Project, the Engineer will prepare
 a Final Inventory [and] . . . will certify it to [Socket], together with a certificate of
 the total cost of the construction performed. Upon the approval of such certificates
 by [Socket] and the Administrator, [Socket] shall make payment to [ADB] of all
 amounts to which [ADB] shall be entitled thereunder which shall not have been
 paid[.] . . .

 The contract commencement date—the date triggering the 150-day completion deadline—

was September 13, 2012. On September 15, 2012, Fail Engineering (the firm hired by Socket to

perform engineering services for the project) provided ADB with a weekly progress report on a

4
 The “Engineer” referred to the engineer hired by Socket to provide engineering services for the project.
5
 The “Administrator” referred to the “Administrator of the Rural Utilities Services” and his “duly authorized
representatives.”

 4
pre-printed form created by the RUS (“RUS Report”). An RUS Report “documents weekly

production rates, build rates,” “the amount of cable placed, conduit placed,” and “contract

extensions . . . around weather, material delays, or any such delays.” The September 15th RUS

Report stated that “the date construction was scheduled to be completed per the [C]ontract” was

April 8, 2013. Representatives of ADB, Socket, and Fail Engineering signed the September 15 th

RUS Report. As discussed more fully herein, Fail Engineering did not provide ADB with any other

RUS Reports until “the end of the project” as “part of the project closeout.”

 On July 24, 2013, Fail Engineering sent correspondence to ADB advising that the “time

for completion of construction pursuant to the [Contract] including weather days and granted time

extensions was June 27th, 2013,”6 and that because ADB had still not completed its work, Socket

would be seeking liquidated damages beginning July 24, 2013 in the amount of $2,500 per day.

 ADB completed its work on August 23, 2013. The Certificate of Completion signed by

Socket, Fail Engineering, and the RUS provided that the date of Completion of Construction was

September 30, 2013. In October 2013, Socket sent correspondence to ADB advising that it had

assessed 30 days of liquidated damages—from July 24, 2013 to the date ADB had actually

completed construction, as opposed to the later date documented in the Certificate of

Completion—which amounted to $75,000. Socket withheld these funds from the retainage owed

to ADB, which by the conclusion of the project was $109,384. Socket released the remaining

retainage—$34,384—to ADB.

6
 A “weather day” was a day that ADB was unable to work “due to weather conditions,” and such days extended the
150-day deadline. The Contract defined a “weather day,” and Fail Engineering made the call “[o]n whether a weather
day was in existence[.]” The parties do not dispute the number of “weather days” designated by Fail Engineering.
Additionally, in November 2012, Socket added the installation of “192 cross bores” to the work order, which was
“signed off by both parties.” This “change order” added 63 days to the project.

 5
 ADB initiated this action for breach of contract in 2015. In its petition, ADB alleged that

it furnished the labor and material required of it under the Contract, Socket failed to pay ADB the

amount owed to it, and, because of such failure, Socket failed to perform its contractual

obligations. ADB requested attorney’s fees and interest pursuant to section 431.180, RSMo,

Missouri’s Private Prompt Pay Act.

 A one-day bench trial was conducted on September 24, 2019. ADB presented the testimony

of one witness, Jason Lynd, ADB’s vice president and the manager for this project. Lynd testified

that pursuant to the Contract, Socket was responsible for obtaining all easements and rights-of-

way, as well as certain materials necessary for laying the fiber, and that ADB could not perform

its work without these items. Lynd stated that Socket had not obtained all easements by the contract

commencement date, Socket continued to obtain easements as the project moved along, and the

easements were not obtained in a logical sequence, forcing ADB “to bounce around to different

areas,” thereby impacting ADB’s schedule. ADB had to demobilize a plow crew—i.e., “find

another home on another project for those crews and that equipment”—for three months because

the crew “ran out of areas that [it] could construct” due to a lack of easements. Lynd further stated

that material shortages resulted in down time and loss in production.

 Lynd described weekly conference calls in which representatives from Socket, ADB, and

Fail Engineering discussed progress, the schedule, and any issues with the project. Each week,

prior to the conference call, ADB prepared “notes” listing topics to discuss on the call and

distributed the notes to Socket and Fail Engineering. These notes “list[ed] out all of the easements,

rights-of-ways, and any material that [ADB] would have been waiting on,” so that ADB could

receive updates on the status of those items. ADB advised Socket on these calls that ADB’s

schedule was being impacted by the delay in receiving easements and materials.

 6
 Lynd also testified about RUS Reports, stating that Fail Engineering was “supposed to”

provide ADB with a weekly RUS Report, however that only occurred the first week of the project.

At the end of the project, Fail Engineering provided ADB with “a pile” of RUS Reports and “asked

[ADB] to sign them as part of the project closeout.” Lynd testified that he completed the reports

at the end of the project because it was necessary in order to close out the Contract. In each RUS

Report he signed and completed at the end of the project, Lynd added the following language:

“Contractor does not agree with the number of days of delay stated above. Contractor reserves its

right to assert additional time delays arising from the failure to timely secure easements and right-

of-way, weather, late delivery of material, and other impacts on contractors schedule.”7

 Lynd testified that the manner in which ADB was to notify Socket of any time-extension

requests was to include such a request in an RUS Report.8 Counsel for Socket asked Lynd whether

ADB ever made a timely written request for an extension of time, and Lynd stated that ADB did

not:

 Q. And it’s true that at no time did you ever promptly notify Socket in writing
 within ten days of any desire to extend the time of completion. Is that - - that’s
 accurate?

 A. I don’t believe so, no.
 ...

 Q. And if you believe that caused a delay in your ability to complete construction,
 you would have submitted, within ten days, a written notice to Socket; correct?

 A. Correct. And we did so through our call notes of any material, easements, or
 right-of-ways every week. We could never ascertain the specific number of days
 for the extension because it was ongoing throughout the duration of the project.

 Q. So you never actually requested an extension; correct?

7
 At the time Lynd received “the pile” of RUS Reports and added the reservation language to those reports, Socket
had already advised ADB that it intended to assess liquidated damages based on ADB’s completion of construction
after the project deadline.
8
 The Contract did not reference RUS Reports and did not mandate extension requests be made in an RUS Report.

 7
 A. Not in a number of days.

 Q. And you never documented any particular day that you were claiming required
 a compensating extension date; correct?

 A. We were documenting every week all of the areas that we could not work.

 ...

 Q. And there is not a single form in which you indicated that you were requesting
 an extension of time for construction; correct?

 A. Correct.

 ...

 Q. Whose obligation is it under the contract, in your understanding, to ask for an
 extension of the construction deadline?

 A. That would be mine, which we’ve done through the delays noted in the weekly
 calls.

When asked whether there was an agreement to extend the deadline for the completion of

construction, Lynd responded, “Not agreed upon, no.” Lynd did not know the exact number of

days ADB was delayed by Socket’s failure to timely obtain easements and materials, and he could

not “narrow[] down exactly what those days would look like.”

 After ADB completed its presentation of evidence, Socket presented the testimony of two

witnesses—Carson Coffman, the president and one of the owners of Socket, and Matt Kohly, a

director of government affairs at Socket—and read into the record excerpts of the deposition of

Donny Smith, an employee of Fail Engineering.

 At the conclusion of the trial, the trial court requested that the parties submit proposed

judgments and advised that they could submit their “basis for - - and the amount of attorney’s fees

in an affidavit.” Socket’s counsel objected to this procedure for submitting the issue of attorney’s

fees. The parties submitted proposed judgments. ADB attached to its proposed judgment an

 8
affidavit of counsel regarding attorney’s fees, expenses, and costs. On October 16, 2019, the trial

court entered its initial judgment, and thereafter entered a corrected judgment on October 30, 2019.

In its corrected judgment, the trial court found:

 • Socket failed to timely obtain certain materials and the necessary easements
 causing delays in ADB’s work under the Contract.

 • ADB provided notice of Socket’s delays and impact on ADB’s schedule
 and performance of the work during the weekly meeting, and the weekly
 meeting minutes were distributed to all attendees, including Socket
 representatives.

 • ADB reserved its rights to assert a delay claim and request additional time
 to perform the work in the weekly RUS reports submitted to Socket.

 • ADB was entitled to extensions of time equal to the period of delay to
 complete the work under the Contract.

 • ADB furnished the labor and material required of it under the Contract
 within the extension of time that ADB was entitled to, due to Socket’s
 delays and failure to perform under the Contract.

 • The number of days of delay experienced by ADB attributable to Socket’s
 breach of contract exceeded the number of additional days Socket added to
 the Contract.

 • Socket has improperly withheld liquidated damages from ADB.

 • Although ADB has demanded payment from Socket of the remaining
 balance owed to ADB in the sum of $74,900.00,9 which amount represents
 retention owed to ADB and money Socket is withholding as liquidated
 damages, Socket has failed to pay this amount and, has therefore, materially
 breached the Contract.

 • Socket did not make all scheduled payments pursuant to the terms of the
 Contract. Application of prejudgment interest pursuant to section 431.180
 is therefore appropriate.

 • Pursuant to section 431.180.2, the court may award reasonable attorney’s
 fees to the prevailing party. Attached hereto as Exhibit 39 is an Affidavit of
 Brian E. McGovern attesting to the attorney’s fees ADB has incurred to

9
 This is the amount ADB alleged in its petition that Socket improperly withheld.

 9
 date.10

The trial court entered judgment in favor of ADB and against Socket “in the amount of

$190,936.74 ($74,900.00 plus $41,646.45 in statutory prejudgment interest, plus reasonable

attorney’s fees in the amount of $74,390.29).”

 Socket filed a motion to amend or correct the judgment, and the trial court heard argument

on the motion. The trial court did not rule on the motion within the time specified in Rule 78.06,11

and thus the motion was denied. This appeal followed.

 Standard of Review

 “On review of a court-tried case, an appellate court will affirm the circuit court’s judgment

unless there is no substantial evidence to support it, it is against the weight of the evidence, or it

erroneously declares or applies the law.” Ivie v. Smith, 439 S.W.3d 189, 198-99 (Mo. banc 2014)

(citing Murphy v. Carron, 536 S.W.2d 30, 32 (Mo. banc 1976)). “Substantial evidence is evidence

that, if believed, has some probative force on each fact that is necessary to sustain the circuit court’s

judgment.” Id. at 199. When reviewing whether the trial court’s judgment is supported by

substantial evidence, we accept as true the evidence and inferences favorable to the judgment and

disregard all contrary evidence. Id. at 200. “We defer to the court’s determination of the witnesses’

credibility and the weight to be given their testimony.” Star Dev. Corp. v. Urgent Care Assocs.,

Inc., 429 S.W.3d 487, 491 (Mo. App. W.D. 2014).

 “We review issues of contract interpretation de novo.” Brown v. Brown-Thill, 437 S.W.3d

344, 348 (Mo. App. W.D. 2014).

10
 No such exhibit was attached to the judgment.
11
 “Any motion for new trial, motion to amend the judgment or opinion, or motion for judgment notwithstanding the
verdict is overruled for all purposes if the trial court does not rule on it within ninety days after the date the last such
timely motion is filed.”

 10
 Analysis

 Socket raises three points on appeal. In its first point it asserts “[t]he trial court erred when

it granted judgment in favor of ADB, because there is no substantial evidence to support the trial

court’s finding that ADB completed construction by the contractual deadline (and that ADB

therefore owed no liquidated damages), in that ADB admitted both (A) that it did not request any

extension of the construction deadline and (B) that no extension was ever agreed, and (C) it is

undisputed that ADB did not meet the contractual or any agreed upon deadline.” Socket’s second

and third points assert the trial court erred in awarding attorney’s fees and prejudgment interest to

ADB. We find Socket’s first point dispositive, and agree that the trial court’s judgment was not

supported by substantial evidence.

 The trial court found that ADB was entitled to extensions of time to complete its work

equal to the period of delay the trial court concluded was caused by Socket, and that ADB

completed the work required of it under the Contract “within the extension of time that ADB was

entitled to[.]” However, these findings were not supported by the evidence. Under the plain

language of the Contract, the deadline for ADB to complete construction could be extended if

Socket failed to provide necessary materials and easements, but only if ADB requested to extend

the deadline, in writing, within ten days “after the happening of any event relied upon by [ADB]

for such an extension of time.” Lynd, ADB’s sole witness, conceded that there was “not a single

form in which [ADB] indicated that [it was] requesting an extension of time for construction.”

 Although Lynd testified—and the trial court found—that ADB advised Socket that

Socket’s failure to obtain materials and easements delayed ADB’s schedule, merely providing

notice to Socket of delay did not, under the plain language of the Contract, operate to extend the

deadline to complete construction: ADB was required to make a timely written extension request.

 11
The trial court cited the weekly conference calls, the weekly conference call “minutes”—i.e., the

pre-call notes distributed to attendees—and the RUS Reports as the bases for its finding that ADB

provided sufficient notice of delay to extend the deadline for completion of construction. However,

any discussion that occurred in the weekly conference calls did not constitute a written extension

request, the pre-call notes did not contain any extension requests, and the RUS Reports, which

were completed at the end of the project, merely documented ADB’s reservation of “its right to

assert additional time delays” in the future. Although ADB presented evidence at trial that Socket

caused ADB delay, there was no evidence that ADB requested an extension of the construction

deadline in writing, let alone within ten days of any event alleged to have caused the delay, as

required by the Contract.

 “If the contract terms are unequivocal, plain, and clear, the court is bound to enforce the

contract as written.” HCI Investors, LLC v. Fox, 412 S.W.3d 424, 440 (Mo. App. W.D. 2013).

Here, the Contract set forth the procedure for ADB to receive an extension of the construction

deadline, and its terms were unequivocal, plain, and clear. ADB did not follow this procedure, and

thus was not entitled to an extension of time to complete construction. As such, the trial court’s

findings that ADB completed its work within the construction deadline and that, as a result, Socket

breached the Contract by withholding the agreed to liquidated damages amount and failing to pay

ADB for all work completed, were not supported by substantial evidence. Point I is granted.12

12
 ADB argues, for the first time on appeal, that “Socket was still not entitled to assess and withhold for liquidated
damages because there was no evidence that Socket suffered an ‘actual harm or damage’ due to any alleged delay,”
relying on Arcese v. Daniel Schmitt & Co., 504 S.W.3d 772, 781 (Mo. App. E.D. 2016) (“In Missouri, before triggering
a liquidated damages provision, our courts have consistently held that the party requesting enforcement of the
liquidated damages provision must show at least some actual harm or damage caused by the breach.” (internal marks
omitted)). This theory of recovery was not alleged in ADB’s petition, argued at trial, or otherwise developed in the
record before us. Without ADB raising this issue, it was hardly incumbent upon Socket—the defendant—to
independently present evidence at trial of the harm or damage it suffered from ADB’s failure to complete its work
within the contract deadline. And while this issue was not raised before the trial court, we find it inaccurate to say
there was no evidence that Socket suffered harm from ADB’s delay. The Contract itself provided that “[t]he time of
Completion of the Construction of the Project is of the essence of this Contract,” and in response to the trial court’s

 12
 Socket’s second and third points assert the trial court erred in awarding attorney’s fees and

prejudgment interest to ADB. In light of our determination as to Point I, we agree that ADB is not

entitled to these awards. The trial court awarded ADB attorney’s fees and interest pursuant to

section 431.180, Missouri’s Private Prompt Pay Act (the “Act”), which requires that “[a]ll persons

who enter into a contract for private design or construction work . . . shall make all scheduled

payments pursuant to the terms of the contract” and provides that a party who has not been timely

paid may bring an action “against a person who has failed to pay.” See § 431.180.1, .2. The Act

further provides that a court may “award interest at the rate of up to one and one-half percent per

month from the date payment was due pursuant to the terms of the contract, and reasonable

attorney fees, to the prevailing party.” § 431.180.2. As discussed above, the evidence showed that

ADB did not complete its work within the construction deadline and thus Socket was entitled to

withhold liquidated damages pursuant to the terms of the Contract. Accordingly, ADB was not a

prevailing party entitled to attorney’s fees and interest under section 431.180.

 Conclusion

 The judgment of the trial court is reversed and we remand with instructions that the trial

court enter judgment in favor of Socket.13

 __________________________________________
 EDWARD R. ARDINI, JR., JUDGE

All concur.

questions on an unrelated topic, Socket witness Carson Coffman testified that Socket “continued to hear from the
RUS, ‘Why isn’t this project done. We need answers. We need answers,’” the RUS questioned Socket directly “Why
is this section not closed out? Why have you not spent the money for this area?” and the RUS expressed worry to
Socket in this regard.
13
 ADB filed a Request for Attorney’s Fees on Appeal. That request is denied.

 13