

# Missouri Court of Appeals

## Southern District

### Division Two

TERRY A. GUENGERICH and )
LORRAINE GUENGERICH, )
                                       )
        Plaintiffs-Appellants, )
                                        )
v. )        No. SD31479
                                        )       Filed: 3-10-14
KAYLA BARKER and CLARENCE )
EDWARD HIGGINS, JR., )
                                         )
        Defendants-Respondents. )

### APPEAL FROM THE CIRCUIT COURT OF DOUGLAS COUNTY

Honorable R. Craig Carter, Associate Circuit Judge

## <u>AFFIRMED AS MODIFIED</u>

Terry and Lorraine Guengerich (hereinafter referred to individually by their given names and collectively as Sellers) appeal from a judgment ordering them to pay damages arising out of a contract to sell real estate to Kayla Barker and Clarence Higgins (hereinafter referred to individually by their given names and collectively as Buyers). The trial court found for Buyers on their counts alleging unjust enrichment and breach of contract. Sellers contend: (1) the trial court erred in finding that Sellers had been unjustly enriched; (2) the trial court erred in finding that Sellers had materially breached the contract; and (3) Buyers failed to present substantial evidence to support certain items

awarded as damages. Because the trial court correctly found for Buyers on their breach of contract count, they were entitled to recover damages on that count. Since it is clear from the judgment that the damages from the breach of contract duplicated the amounts awarded on the unjust enrichment count, any error as to the latter count was immaterial and need not be addressed. We agree with Sellers, however, that the trial court erred in two respects in assessing Buyers' damages. Pursuant to Rule 84.14, we affirm the judgment as modified.[1]

## I. Standard of Review

We will affirm the decision in a court-tried case unless there is no substantial evidence to support it, it is against the weight of the evidence, or it erroneously declares or applies the law. *Greenstreet v. Fairchild*, 313 S.W.3d 163, 168 (Mo. App. 2010). The trial court's judgment is presumed correct, and Sellers have the burden of proving it erroneous. *Surrey Condominium Ass'n, Inc. v. Webb*, 163 S.W.3d 531, 535 (Mo. App. 2005). An appellate court is primarily concerned with the correctness of the trial court's result, rather than the route taken by the trial court to reach that result. *Business Men's Assur. Co. of America v. Graham*, 984 S.W.2d 501, 506 (Mo. banc 1999). Therefore, we will affirm the trial court's judgment under any reasonable theory supported by the evidence, even if the reasons advanced by the trial court were wrong or insufficient. *Ewanchuk v. Mitchell*, 154 S.W.3d 476, 481 (Mo. App. 2005); *Jackson v. Cannon*, 147 S.W.3d 168, 173 (Mo. App. 2004).

In conducting our review, "we accept as true the evidence and permissible inferences favorable to the prevailing party and disregard contrary evidence and

---

[1] All references to rule are to Missouri Court Rules (2013).

inferences." ***Gordon A. Gundaker Real Estate Co., Inc. v. Maue***, 793 S.W.2d 550, 551 (Mo. App. 1990). "We defer to the trial court's determinations regarding credibility; however, we review issues of law *de novo*." ***Greenstreet***, 313 S.W.3d at 169. The following summary of the facts has been prepared in accordance with these principles.

## II.  Factual and Procedural Background

Sellers owned 71 acres of land in Douglas County. The property consisted of two adjoining parcels of land, separated by a county road. Sellers had orally leased both parcels of land to Rick and Nicole Dehaan (the Dehaans) to pasture their cattle for a per-head monthly fee.

Sellers decided to sell the parcel of land lying south of the county road. This fenced parcel, which Sellers believed to be 20 acres in size, contained a 3,800-square-foot home and a barn. Shortly after Buyers moved from Colorado to Missouri, they offered to purchase this parcel of land (hereinafter referred to as the 20-acre parcel) from Sellers. Buyers had a herd of 15 horses and needed a location suitable for that number of animals. Buyers' offer included, *inter alia*, the following provisions: (1) the purchased property would be financed with a seller-financing agreement; (2) Buyers would execute a promissory note for the purchase price, bearing interest at 5½ percent to Sellers; (3) Sellers would provide title insurance; (4) the washer and dryer would be left in the home and included in the purchase price; (5) Sellers would provide a one-year home warranty; (6) Sellers would provide a termite clearance letter; and (7) Buyers would be entitled to possession of the purchased property at the time of closing and a right of first refusal on the adjoining 51 acres across the county road (hereinafter referred to as the 51-acre

parcel). Buyers also offered to maintain the 51-acre parcel in exchange for being able to use it to pasture their horses. This offer was made on September 4, 2009.

Sellers' agent prepared a counteroffer. This counteroffer proposed that the interest rate on the promissory note be set at 6 percent and provided a right of first refusal on the 51-acre parcel. The counteroffer did not mention the use of the 51-acre parcel prior to exercise of the right of first refusal. The counteroffer also stated that any "unchanged terms" remained part of the new offer. Buyers accepted the modifications and signed the counteroffer.

The closing on the purchased property was conducted on September 24, 2009. At that time, Buyers were not provided with a home warranty, a title insurance policy or a termite clearance letter. Sellers did execute an affidavit stating that there were no leases or encumbrances on the purchased property. At the closing, Sellers and Buyers executed a contract for deed. Pursuant to that contract, Buyers paid $50,000 down and executed a promissory note for the balance of the purchase price in the amount of $250,000 at 6 percent interest. The monthly purchase price payments were $1,791.08 to be paid on the 25th of each month. The agreement provided that Sellers would deposit a warranty deed in escrow and that Sellers would provide a title insurance commitment. The warranty deed would be delivered to Buyers upon payment of the full purchase price. Buyers executed a quit claim deed to Sellers to be placed in escrow. The quit claim deed would be delivered to Sellers upon default by Buyers. The contract for deed did not contain an integration clause or a statement that it represented the entire agreement of the parties. The contract for deed further contained the following two provisions regarding taxes and insurance:

4

## TAXES:

**SELLER** shall annually receive the annual real estate tax statement and shall forward to **BUYER** the amount of real estate taxes due. **BUYER** shall forward payment to **SELLER** by December 15th of each year. Failure of **BUYER** to reimburse **SELLER** shall constitute default and the escrow agent is authorized to deliver to **SELLER** the Quit Claim Deed heretofore mentioned.

## INSURANCE:

**BUYER** shall carry insurance equal to or in excess of the unpaid balance of this agreement, with a loss-payable clause in favor of **SELLER. IT IS AGREED** that the obligation to keep the premises insured is continuous throughout the pendency of this agreement. **IT IS AGREED** that in the event **BUYER** shall fail to keep the premises insured that same shall constitute default and that **SELLER** shall, at their option, obtain insurance and the **ESCROW AGENT** is authorized to deliver to **SELLER** the Quit-Claim Deed heretofore mentioned.

Buyers provided a receipt for insurance coverage at closing.

When Buyers brought their horses to the purchased property on September 24th, there was a herd of cows and a bull on the 20-acre parcel. The 51-acre parcel also had cattle grazing on it. Nicole Dehaan, to whom the cattle belonged, stopped by the 20-acre parcel on the 24th and said that the Dehaans had leased that property from Sellers on a month-to-month basis to pasture her cattle. Buyers placed their horses in an enclosed, one-acre paddock on the 20-acre parcel. There was not sufficient pasture in that enclosure to feed the horses, so Buyers were required to purchase hay for the animals.

Sellers told Buyers that they would have to execute a written lease on the 51-acre parcel to "trump" the Dehaans' oral lease on the 20-acre parcel and thereby authorize the removal of her cattle from that land. Buyers signed a written agreement leasing the 51-acre parcel for $200 per month so they could get the Dehaans' cattle off the 20-acre

5

parcel. Buyers also learned from the county assessor that the 20-acre parcel purchased by Buyers included some acreage beyond the fence.

On October 4, 2009, Buyers called the sheriff's department because the Dehaans' cattle were still on the 20-acre parcel. The sheriff's deputy who responded to Buyers' call examined some paperwork provided by the Deehans and determined that they had until November 1st to remove the cattle from the 20-acre parcel. The cattle remained on Buyers' land until that date. From the date of closing through November 1st, Buyers spent $400 on hay to feed their horses. After the cattle were removed, Buyers still had to purchase additional feed for the horses because the land had not recovered enough to provide sufficient grazing for those animals.

When Buyers moved into the home, they discovered that Sellers had left some furniture and other personal property in the home. Additionally, the washer and dryer had been replaced with an older washer and dryer that did not work. Buyers rented a washer and dryer set. By the time of trial, Buyers had spent $3,145 to rent those appliances. Buyers also were concerned about the home warranty because they wanted to make a claim about the washer and dryer on the home warranty. When Buyers spoke with Sellers' agent about the issue, she said she needed a check for $509 right then to activate the home warranty. Buyers paid that amount to the escrow company so that they could get the home warranty implemented.

Meanwhile, the check Buyers had used to pay the insurance premium had been dishonored because of a bank error. A cancellation notice was sent to Sellers on October 23, 2009. Sellers did not forward that information to Buyers, and Buyers never received that notice.

By December 15th, Buyers had not received any documentation about the tax bill. On December 28th, Terry came to Buyers' home and demanded the tax money. Buyers refused because they thought those taxes had been paid at closing. Terry became angry, and eventually Buyers asked him to leave.

On December 31, 2009, the attorney at the escrow company sent Buyers a default letter. The body of that letter stated:

> Pursuant to a request from [Sellers], this letter is to serve as notification that you are in default in the terms under the above mentioned Contract for Deed. The grounds for default are failure to keep insurance on property and failure to pay the 2009 taxes to [Sellers] by December 15th deadline listed in the Contract for Deed.
>
> If you refute the grounds of the default you must contact our office within twenty (20) days from receipt of this notice. If I do not hear from you within the allotted time, I will be authorized to deliver the Quit Claim Deed held in escrow to [Sellers]. Delivery of this Quit Claim Deed releases any claim you have in the property held under the Contract for Deed.

The letter was sent certified mail, and Buyers received it on January 5, 2010. On January 14, 2010, Kayla responded to the notice in a seven-page letter with attachments. Kayla sent copies of that letter to the escrow company, Buyers' real estate agent and Terry. In the letter, Kayla explained that her mother had wired $51,000 to the escrow company prior to closing. Kayla also explained why they believed the 2009 taxes had been paid at closing. She included a check for the amount of the 2009 taxes with the copy of the letter that she sent to Terry. The letter also explained that Buyers had not received the documentation regarding the tax bill to which they were contractually entitled. Kayla further noted that, even after speaking with Terry on December 28th, she had to clarify the amount of tax due with the assessor's office. This letter also discussed

7

the issue with the cattle, the lack of a termite clearance letter, the lack of a home warranty, and Buyers' efforts to remedy the insurance issue.

The escrow company received Buyers' letter on January 20, 2010. The quit claim deed was recorded on January 22, 2010. The escrow company made no attempt to address Buyers' complaints prior to filing the quit claim deed. Sellers instructed the escrow company not to deliver the quit claim deed on Buyers at that time.

By February 5, 2010, knowing that the quit claim deed had been recorded, Sellers obtained insurance for the property. The parties then spent about two months attempting to renegotiate the real estate sales contract. During this time, Sellers did not inform Buyers that the quit claim deed had been recorded, and Sellers accepted a payment on the contract for deed from Buyers. Sellers wanted Buyers to give back the property behind the fence in exchange for a change in the due date for the monthly purchase price payments. Even though such an arrangement would have left Buyers with about 12 acres instead of 20, Terry refused to adjust the purchase price. These negotiations were not fruitful. Eventually, Buyers received notice that their insurance policy had been canceled because the quit claim deed had been filed.

On May 12, 2010, Sellers filed a petition against Buyers seeking ejectment and rent. Buyers filed a counterclaim that included a count for breach of contract, a count for unjust enrichment, and two counts alleging fraudulent misrepresentation.

A two-day bench trial was conducted in April 2011. The trial court found, *inter alia*, that "[Sellers] failed to have the property vacant at the time of closing, swapped the washer and dryer for less-valuable models, refused to purchase a home warranty, and failed to properly deliver the yearly tax bill, all of which were their contractual duties."

8

The court also found that Sellers had failed to deliver possession of the 20-acre parcel to Buyers because the Dehaans' cattle were on the property. Because Buyers no longer wanted the 20-acre parcel and consented to the entry of a judgment in Sellers' favor on their ejectment count, the trial court found for Sellers and awarded them $16,150 in rent. The court concluded that it was Sellers' actions which caused the real estate transaction to fail. The court awarded $59,792.09 in damages to Buyers on their unjust enrichment count.[2] The court also found that Sellers had materially breached the contract, but Buyers were only awarded $12,154 in damages on that count to avoid a double recovery.[3] After subtracting Sellers' damages from the total amount of Buyers' damages, the trial court entered a net judgment in favor of Buyers in the amount of $55,796.09. Sellers appealed.

### III. Discussion and Decision

In Point I, Sellers contend the trial court erred in finding for Buyers on their unjust enrichment count. In Point II, Sellers contend the trial court erred in finding that they had materially breached the contract. In Point III, Sellers contend there was no substantial evidence to support the award of damages. For ease of analysis, we will address Sellers' points out of order.

---

[2] Those damages consisted of: (1) $49,836.69 paid by Buyers at closing; (2) installment payments in the amount of $8,955.40; and (3) $1,000 paid by Buyers on the lease agreement.

[3] Allowing Buyers to recover the same damages via a breach of contract and an unjust enrichment theory would violate Missouri's rule that a party cannot be compensated for the same injury twice. *See, e.g.*, *MECO Systems, Inc. v. Dancing Bear Entertainment, Inc.*, 42 S.W.3d 794, 810-11 (Mo. App. 2001) (holding that a party could not recover the same damages via a breach of contract and unjust enrichment theory). The trial court recognized and applied that rule in the judgment by stating that, "for the breach of contract claim, as the Court has already granted the [Buyers] damages on their unjust enrichment count, the Court must not grant duplicate damages."

*Point II*

In Sellers' second point, they contend the trial court misapplied the law by finding that Sellers had materially breached the contract. Sellers argue that: (1) they were entitled to file the quit claim deed based on the provisions of the real estate contract; and (2) their own breaches of contract were not material. We disagree.

Sellers' argument that they were entitled to record the quit claim deed is based upon the premise that Buyers' failure to obtain insurance constituted a default. That argument ignores the well settled principle that a party to a contract cannot claim its benefit where he is the first to materially breach it. *See, e.g.*, **Boten v. Brecklein**, 452 S.W.2d 86, 92 (Mo. 1970); **Matt Miller Co., Inc. v. Taylor-Martin Holdings, LLC**, 393 S.W.3d 68, 88 (Mo. App. 2012); **Barnett v. Davis**, 335 S.W.3d 110, 112 (Mo. App. 2011). A breach of contract is material if the breach relates to a vital provision of the agreement that goes to the substance or root of the agreement. **G & J Holdings, LLC v. SM Properties, LP**, 391 S.W.3d 895, 903 (Mo. App. 2013). The materiality of a breach is a question of fact. **Matt Miller Co.**, 393 S.W.3d at 88; **Classic Kitchens & Interiors v. Johnson**, 110 S.W.3d 412, 417 (Mo. App. 2003).

Here, the trial court found that Sellers were in breach of the real estate sales contract immediately after the closing by: (1) failing to leave the house vacant; (2) switching out the washer and dryer for less valuable models; (3) refusing to purchase a home warranty as they promised; and (4) failing to remove the Dehaans' cattle by the date of closing. The first and fourth listed breaches tended to deprive Buyers of their rightful possession of the property, which goes to the very substance or root of the agreement. The third breach deprived Buyers of their home warranty, which was another

10

valuable benefit of the real estate sales contract. We reject Sellers' argument that their breaches of contract were not material.

Assuming *arguendo* that the foregoing breaches by Sellers were not material, our disposition of this point would not change. Sellers argue that they were entitled to file the quit claim deed because Buyers failed to keep the property insured. That argument fails because the trial court implicitly found that: (1) Sellers waived their right to place Buyers in default based on that breach; and/or (2) Buyers' untimely performance in obtaining insurance was excused because it was the result of a bank error.

With respect to the first issue, "[t]here is no doubt that any default in the performance of a contract may be waived." *Donahue v. State*, 655 S.W.2d 642, 645 (Mo. App. 1983). Whether a party has waived a right to declare a forfeiture is a question of fact best left to the trial court. *Langdon v. United Restaurants, Inc.*, 105 S.W.3d 882, 890 (Mo. App. 2003).

Here, the trial court found that a bank error caused Buyers' check to be dishonored. Sellers learned of the cancellation of Buyers' insurance on October 23, 2009. Sellers did not forward that information to Buyers. After approximately two months elapsed, Sellers then demanded that Buyers pay the property taxes on the 20-acre parcel, which is inconsistent with an intention to declare a default. The December 31st letter also did not declare a default. Instead, it gave Buyers 20 days to respond to the allegations of default and implicitly offered them an opportunity to cure. Buyers' timely response tendered payment of the property taxes, and explained why the insurance had

11

lapsed and how they intended to remedy that problem.[4]  Notwithstanding that response, and before expiration of the 20-day period granted in the letter, Sellers filed the quit claim deed.  Buyers were not notified of that event, and Sellers continued to treat the real estate contract as being in effect.  The parties continued to discuss a renegotiation of the contract, and Sellers accepted one monthly installment on the contract from Buyers.  Under these circumstances, the trial court did not err in implicitly finding that Sellers could not rely upon Buyers' failure to maintain insurance to declare a default because the Buyers' breach was excused or because Sellers waived or were estopped from relying upon that ground.  *See, e.g.*, ***Langdon***, 105 S.W.3d at 890; ***Rietsch v. T.W.H. Co., Inc.***, 702 S.W.2d 108, 117-18 (Mo. App. 1985); ***Fieser Services, Inc. v. Saline Sewer Co.***, 643 S.W.2d 92, 93 (Mo. App. 1982); ***Johnson v. Farrow***, 594 S.W.2d 655, 658 (Mo. App. 1980).  Point II is denied.

*Point I*

In Sellers' first point, they contend the trial court misapplied the law in finding that Buyers had been unjustly enriched.  For the reasons that follow, it is unnecessary to address this point.

"[A]ppellate courts are primarily concerned with the correctness of the result reached by the trial court[.]" ***Hunt v. Estate of Hunt***, 348 S.W.3d 103, 108 (Mo. App. 2011).  Thus, "[a] correct result will not be disturbed on appeal merely because the trial

---

[4]  Sellers were required to provide notice of default to Buyers even though the contract was silent on that issue.  As explained in ***Long v. Smith***, 776 S.W.2d 409 (Mo. App. 1989), "[f]orfeitures are not favored and, if the contract does not provide for it or if time is of the essence but has been waived, it is necessary that the vendor give the vendee notice of his intention to forfeit the contract before the vendee may be deprived of equitable relief against the forfeiture." ***Id***. at 414.  Assuming time was of the essence with respect to insurance, Sellers' conduct furnished clear evidence of their intent to waive that requirement.

court gave a wrong or insufficient reason for its judgment." ***Harris v. Desisto***, 932 S.W.2d 435, 443 (Mo. App. 1996).

Assuming *arguendo* that the trial court erred in granting relief on the unjust enrichment count, the error did not materially affect the outcome. We have already determined that the trial court properly found for Buyers on their breach of contract count. It also is clear from the judgment that Buyers would have been awarded the same total amount of damages, even if the trial court had found for Sellers on the unjust enrichment count. Rule 84.13(b) states that "[n]o appellate court shall reverse any judgment unless it finds that error was committed by the trial court against the appellant materially affecting the merits of the action." ***Id***. Because any error the trial court may have committed with respect to the unjust enrichment count is immaterial, Point I is denied. *See* ***Harris***, 932 S.W.2d at 443; Rule 84.13(b).

*Point III*

In Sellers' third point, they contend the trial court erred in awarding various types of damages to Buyers because the evidence was insufficient to support those awards. Sellers argue that: (1) the trial court made a mathematical error with respect to the amount of Buyers' down payment; (2) the court should not have awarded $1,000 that Buyers paid to lease the 51-acre parcel; (3) the court should not have awarded Buyers the $500 they paid for horse feed; (4) the court should not have awarded the rental cost of the washer and dryer because it was not the proper measure of damages and included costs that accrued after forfeiture; and (5) the court should not have awarded $8,000 to Buyers to repay a first-time homebuyers' tax credit because it was uncertain to occur and would not cause a loss even if repaid.

13

Substantial evidence is evidence "which a reasonable mind would accept as sufficient to support a particular conclusion, granting all reasonable inference[s] which can be drawn from it." *Catroppa v. Metal Bldg. Supply, Inc.*, 267 S.W.3d 812, 817 (Mo. App. 2008) (alteration in original). "The trial court's findings related to actual damages are entitled to great weight on appeal and will not be disturbed unless the damages awarded are clearly wrong, could not have been reasonably determined, or were excessive." *Williams v. Williams*, 99 S.W.3d 552, 557 (Mo. App. 2003). Furthermore, "[i]f accepted as true by the fact trier, the testimony of a single witness is sufficient to establish any fact, including the amount of damages." *McClelland v. Williamson*, 627 S.W.2d 94, 98 (Mo. App. 1982); *see also Roark Printing, Inc. v. Worm World, Inc.*, 974 S.W.2d 613, 615 (Mo. App. 1998).

Sellers' first complaint is that the trial court erred in awarding $49,836.69 to Buyers to reimburse them for their down payment. A purchaser's damages in an action for breach of a contract to sell land generally are measured by the difference between the unpaid portion of the purchase price and the value of the land at the time the contract was to be completed. *See, e.g.*, *Wilt v. Waterfield*, 273 S.W.2d 290, 296 (Mo. 1954); *Wooten v. DeMean*, 788 S.W.2d 522, 527 (Mo. App. 1990). This measure of damages does not apply, however, when the vendor retains the land and the contract is rescinded. *Snowden v. Gaynor*, 710 S.W.2d 481, 487 (Mo. App. 1986). In the latter situation, Missouri courts have relied on § 373 of the Restatement (Second) of Contracts. *Kim v. Conway & Forty, Inc.*, 772 S.W.2d 723, 727 (Mo. App. 1989). When a purchaser proves a breach of contract, but nonetheless relinquishes the property to the seller after a period of occupation, the purchaser is entitled to recover: (1) any purchase price payments; (2)

14

other expenses incurred in reliance on the contract; (3) reduced by an amount representing the reasonable value of the use of the property for the time the purchaser was in possession. *Snowden*, 710 S.W.2d at 488.

The closing documents show that Buyers paid $49,327.69 in cash at closing. The trial court appears to have made a mathematical error by adding the later $509 home warranty payment to the down payment figure. The trial court also awarded $509 for the home warranty when discussing Buyers' breach of contract claim. As Buyers acknowledge, a double recovery is not permitted. *See Catroppa*, 267 S.W.3d at 817; *MECO*, 42 S.W.3d at 810-11. Consequently, it was error for the trial court to award the $509 twice, and the appropriate amount for the award based on the down payment should have been $49,327.69. This prong of Sellers' argument has merit.

Sellers' second complaint is that the trial court erred in awarding Buyers $1,000 as reimbursement for the amounts they paid to lease the 51-acre parcel. Sellers argue that these payments should not have been awarded because they involved a separate piece of property. We disagree. When Buyers brought their horses to the 20-acre parcel on September 24th, the Dehaans' cattle herd was on the property. Sellers told Buyers that they would have to sign a written lease on the 51-acre parcel to "trump" the Dehaans' oral lease on the 20-acre parcel and get their cattle removed from that land. Therefore, Buyers' expenditure of $1,000 to lease the 51-acre parcel was directly caused by Sellers' breach of contract in not placing Buyers in full possession of the 20-acre parcel. This prong of Sellers' argument lacks merit.

Sellers' third complaint is that the trial court erred in awarding Buyers the $500 they paid for horse feed because it was not based upon any changed condition in the land.

15

That argument ignores the evidence favorable to the judgment. As noted above, the Dehaans' cattle were on the 20-acre parcel when Buyers took possession. Because Sellers were honoring the Dehaans' oral lease of Buyers' property, they had to place their horses in an enclosed, one-acre paddock on the 20-acre parcel. There was not sufficient pasture in that enclosure to feed the horses, so Buyers were required to purchase hay for the animals. After the cattle were removed, Buyers still had to purchase additional feed for the horses because the land had not recovered enough to provide sufficient grazing for those animals. Thus, Buyers' expenditure of money for horse feed was directly caused by Sellers' breach of contract in not placing Buyers in full possession of the 20-acre parcel. This prong of Sellers' argument lacks merit.

Sellers' fourth complaint is that the trial court erred by awarding Buyers the amount they spent to rent a washer and dryer. Sellers argue that the award is not supported by the evidence because the correct measure of damages should have been the fair market value of the appliances. We disagree. Viewed most favorably to the judgment, Buyers proved the following facts: (1) the real estate sales contract provided that the washer and dryer would be left in the home and included in the purchase price; (2) when Buyers took possession of the house, the washer and dryer had been replaced with an older washer and dryer that did not work; (3) for that reason, Buyers rented a washer and dryer set by the week; and (4) as of the date of trial, Buyers had paid $3,145 to rent those appliances. Therefore, the trial court's award was supported by substantial evidence. All of that evidence was admitted without objection. Sellers simply took the position that the washer and dryer had not been switched, as Buyers contended. The trial court resolved that factual dispute in favor of Buyers. So far as we can determine from

16

the record before us, Sellers' current argument that the trial court used the wrong measure of damages was not advanced below and is being made for the first time on appeal. Therefore, it is not preserved for appellate review. *See Arnold v. Minger*, 334 S.W.3d 650, 653-54 (Mo. App. 2011) (appellant waived any argument that the adverse party's testimony constituted an improper measure of damages by not objecting at trial); *Waldroup v. Dravenstott*, 972 S.W.2d 364, 371 (Mo. App. 1998) (the appellant's failure to object to evidence about the inflationary rate of lumber allowed the trial court to include the inflationary rate in its damages award). An appellate court will not convict a trial court of error with respect to an issue that was not put before it to decide. *Arnold*, 334 S.W.3d at 654; *Baker v. Gonzalez*, 315 S.W.3d 427, 435 (Mo. App. 2010). This prong of Sellers' argument lacks merit.

Sellers' fifth complaint is that the court should not have awarded $8,000 to Buyers to repay a first-time homebuyers' tax credit because it was uncertain to occur and would not cause a loss even if repaid.[5] We agree with the latter part of that argument. As noted above, Buyers opted to seek rescission of the purchase contract.[6] Therefore, they were entitled to recover their purchase price payments and any other expenses incurred in reliance on the contract. *See Snowden*, 710 S.W.2d at 488. The first-time homebuyers' tax credit does not fall into either category. Additionally, Buyers were only able to claim this tax credit because they made a qualifying home purchase. It was Buyers' election to

---

[5] The recapture provisions for the first-time homebuyer's credit are found in 26 U.S.C. § 36(f) (2010); *see Woods v. C.I.R.*, 137 T.C. 159, 164 (U.S. Tax Ct. 2011). At trial, Kayla testified that the IRS told Buyers to repay the tax credit because they only owned the home for three to four months.

[6] The purpose of rescission is to restore the parties to the status quo that existed before they entered into the contract. *See Ehlert v. Ward*, 588 S.W.2d 500, 503 (Mo. banc 1979); *Patel v. Pate*, 128 S.W.3d 873, 878 (Mo. App. 2004).

rescind that caused them to no longer qualify for the tax credit. Therefore, it was error for the trial court to require Sellers to pay $8,000 as damages so that Buyers could repay the first-time homebuyers' tax credit. This prong of Sellers' argument has merit.

"In the interest of judicial economy, this Court may exercise its judicial prerogative to enter the judgment the trial court should have entered." *Lynn v. TNT Logistics North America, Inc.*, 275 S.W.3d 304, 312 (Mo. App. 2008); *see* Rule 84.14. The judgment is modified to reduce Buyers' damages to the amount of $47,287.09. In all other respects, the judgment is affirmed.


JEFFREY W. BATES, J. – OPINION AUTHOR

ROBERT S. BARNEY, Sr. J. – CONCUR

DANIEL E. SCOTT, J. – CONCUR IN PART AND DISSENT IN PART



# Missouri Court of Appeals

## Southern District

### Division Two

TERRY A. GUENGERICH and  )
LORRAINE GUENGERICH,       )
                           )
    Plaintiffs-Appellants,  )
                           )
v.                         )  No. SD31479
                           )
KAYLA BARKER and CLARENCE  )
EDWARD HIGGINS, JR.,       )
                           )
    Defendants-Respondents.  )

## OPINION CONCURRING IN PART AND DISSENTING IN PART

I would reverse the $3,145 awarded to Buyers for renting a washer and dryer by the week for some 17 months, and remand for further proceedings on that issue.[7] Cases cited by the principal opinion (and cases cited in those cases) do not persuade me that Sellers have waived their well-based complaint that this award was improperly calculated and excessive. I concur in the principal opinion in all other respects.

DANIEL E. SCOTT, J. – SEPARATE OPINION AUTHOR

---

[7] *See* **Cason v. King**, 327 S.W.3d 543, 554 & n.12 (Mo.App. 2010); **Boyd v. Lollar**, 985 S.W.2d 403, 406 (Mo.App. 1999). Thus, and purely as a procedural preference, I also would have the trial court make the other reductions indicated by the principal opinion, as opposed to this court doing so under Rule 84.14.