

# In the Missouri Court of Appeals
# Eastern District

## DIVISION THREE

| | | |
|---|---|---|
| K.E.S., | ) | No. ED112164 |
| | ) | |
| Respondent, | ) | Appeal from the Circuit Court of |
| | ) | Jefferson County |
| vs. | ) | |
| | ) | Honorable Katherine M. Hardy-Senkel |
| S.R.S., | ) | |
| | ) | |
| Appellant. | ) | Filed: October 29, 2024 |

## Introduction

S.R.S. ("Appellant") appeals the circuit court's judgment entering a ten-year full order of protection to K.E.S. In his sole point on appeal, Appellant argues the circuit court erred because there was insufficient evidence to extend the order of protection's term under § 455.040.1(4).[1] The circuit court's judgment found Appellant poses a "serious danger to the physical or mental health" of K.E.S. Because there was sufficient evidence to support this finding, the circuit court's judgment is affirmed.

## Factual and Procedural Background

The circuit court found K.E.S.'s testimony to be "candid and credible." Appellant offered no evidence. Viewed in the light most favorable to the judgment, the evidence is as follows:[2]

---

[1] All statutory references are to RSMo. Cum. Supp. (2021), unless otherwise specified.
[2] *D.A.T. v. M.A.T.*, 413 S.W.3d 665, 668 (Mo. App. E.D. 2013).

K.E.S.'s father physically abused her as a child; she watched as he abused three other women as well. While the police were often called, in K.E.S.'s experience, the police always blamed the woman. K.E.S. testified these experiences influenced her relationship with Appellant.

Appellant and K.E.S. started a romantic relationship in February 2022. About six weeks later, on April 14th, Appellant and K.E.S. went on a date. As Appellant was driving K.E.S. home, he berated her. He called her "crazy," "a psycho," "stupid fucking bitch," and a "stupid fucking cunt." When K.E.S. arrived home, she went to her bedroom and locked the door. Appellant followed her inside the house. He ran down the hallway and banged on her locked, six-panel bedroom door so forcefully he punched a large hole in it. The force of Appellant's blows knocked the door off its hinges.

Soon after, K.E.S. searched Appellant's name on Case.net and learned he had pled guilty to an assault charge in 2005. Although Appellant originally told her the charge was from a college bar fight, he eventually admitted the plea arose after his girlfriend's friend accused him of rape and assault.

On July 11th, Appellant repeatedly text messaged K.E.S. He called her "toxic," "manipulative," "psycho," "stupid fucking bitch," "bitch," "stupid fucking cunt," "fucking cunt," and more. He demanded they meet that day, but K.E.S. refused. Appellant then showed up at her house unannounced. She repeatedly asked him to leave, to no avail. Appellant begged K.E.S. to open the door so they could talk. She complied, only opening the front door while keeping her screen door closed. As she opened the front door, Appellant opened her screen door and barged headfirst into her home. She tried to close the front door on him but he pushed her back. K.E.S. fled to her bedroom. She asked him to leave, and he laughed at her, calling her "crazy" and "psycho." Appellant eventually retreated from the bedroom to the main part of the house.

Sometime later, K.E.S. left her bedroom to retrieve her purse. Appellant snatched the purse off her arm and threw it on the kitchen table. He then slapped her behind and restrained her on his lap. K.E.S. returned to her bedroom. She watched Appellant sitting in the dark on her couch from her home camera. She could not fall asleep. Around 2:00 a.m., just before he left the house, Appellant commented about her refusing to have sex with him and called her "worthless" and "toxic."

The next day, July 12th, Appellant barraged K.E.S. with text messages and phone calls. He alternated between apologizing for his behavior and calling her a "stupid fucking cunt" and other names. She blocked his phone number but he made calls with no caller ID and broke through the block. Appellant invited K.E.S. to attend the Cardinals game that night with his friends. She agreed because she hoped Appellant would be on better behavior in public and thought this would stop the incessant phone calls and text messages. On the drive home, K.E.S. and Appellant started fighting, prompting K.E.S to break up with him. At this point, he tried to hold her hand but K.E.S. refused. Appellant responded by calling her "crazy" and a "fucking bitch." Appellant started driving 100 miles per hour in a 30 mile per hour zone, screeched to a halt, and told her to "get the fuck out of his car." K.E.S. exited the car and began the two-and-a-half to three-mile walk home. Appellant headed home, but turned around and drove towards K.E.S.'s home. Appellant caught up with K.E.S. and asked if she wanted a ride. K.E.S. refused. Appellant told her he would let himself inside her house. K.E.S. insisted she did not want him there. He responded, "love you."

When K.E.S. arrived home, she discovered Appellant somehow inside her house and naked on her bed. Although Appellant claimed the front door was open, K.E.S. credibly testified it was not. She asked him to leave, and he responded by calling her more vulgar names. Initially, K.E.S. offered to let him stay in her basement because she could lock the basement door to deny Appellant access to the rest of her house. When this did not satisfy Appellant, K.E.S. picked up his clothes,

3

took them outside, and put them on the hood of his car. While Appellant followed her outside and grabbed his clothes, K.E.S. ran back inside. Appellant chased her and rammed her headfirst through the door. Inside the house, Appellant threw K.E.S. on the floor, flung her against the TV stand, and hurled her onto the coffee table. He put her in a headlock on the floor. K.E.S. freed herself, stumbled out the front door, and ran to a neighbor's house. She asked the neighbor to call 911. The City of Arnold police responded to the 911 call. Appellant later informed K.E.S. he had increased his steroid usage well beyond the prescribed amount. He blamed his steroid usage for his physical assaults. From this date on, K.E.S. only saw Appellant in public or in the presence of his children.

For the next few days, Appellant continuously called and text messaged K.E.S. On July 13th, Appellant's five-year-old twins appeared at her door with flowers and a box. They told her their dad sent them to give her presents. Despite her abusive relationship with Appellant, K.E.S. loved his kids. Because she had had two miscarriages, Appellant told her his twins could be her "new children." K.E.S. accepted the gifts, sent the children back to Appellant, and locked her front door. Thirty seconds later, the doorbell rang again. This time, the twins said Appellant told them they could use her restroom. K.E.S. let the twins inside, and Appellant ran up to the door asking to talk. She shut the door and ushered the kids out after they used the restroom.

Over the next two weeks, Appellant continued his incessant text messages and phone calls. On July 28th, K.E.S. relented and agreed to walk her dog with him in public. On the walk, Appellant started a fight. K.E.S. headed home. Appellant—once again—showed up to her house uninvited. K.E.S. locked her front door, turned off all the lights, and sat in her dark hallway. Appellant banged on her front door, banged on and peered into her son's bedroom window, and made his way into her gated backyard. Appellant peeped into her bedroom window. Seeing no

one, he climbed the deck stairs and tried to enter through a sliding glass door. He broke the door's lock but could not get past the bar along the bottom. Appellant continued texting K.E.S., asking to talk with her. She told him he was scaring her and asked him to leave her house. Appellant left her driveway, then returned, and knocked on K.E.S.'s door again. When K.E.S. did not answer, Appellant texted her from his car. He told her the situation was "crazy," she was being "dramatic," and was in a "toxic state." Appellant left soon after.

Appellant would use his kids whenever the two got into an argument. K.E.S. would receive several voicemails, video messages, audio messages, and videos of his twins crying because they missed her. They begged to see her and her son again. Given Appellant said they could be her "new children," the messages were painful for K.E.S. On September 9th, K.E.S. agreed to see Appellant and his twins. When he began to insult her with vulgar names, she cancelled. On September 23rd, she agreed to go bowling with Appellant and his twins. Thirty minutes before the event, Appellant told K.E.S. one of the twins wanted to watch a movie at his home instead. K.E.S. said that made her uncomfortable, but, because she had promised to see the twins, she went to Appellant's home. After they put the twins to bed, Appellant tried to force himself on K.E.S. She left. The next day was her son's birthday, and she told Appellant he was not welcome at the party. Appellant sent her a video of the twins wishing her son a happy birthday.

In the days after September 23rd, K.E.S. learned the City of Arnold had charged Appellant with assault from the July 13th incident. She testified this charge proved to her the legal system could protect her from abuse. From this day forward, she never physically saw Appellant. He continued to call and send her text messages throughout October and November. He sent her more text messages on December 5th. K.E.S. decided only an order of protection would keep him from

contacting her. She filed a petition for an order of protection on December 6th. The next day, the circuit court granted her an *ex parte* order of protection.

At the hearing for the full order of protection, K.E.S. was asked why she never called the police. She credibly testified Appellant had threatened to call her ex-husband and "blow up" her life, to use his legal connections to avoid criminal charges (as he had in the past), and to call her employer. The circuit court issued a ten-year full order of protection. It found K.E.S. had "tried to end the relationship in a manner that did not involve the extreme remedy of an order of protection, but [Appellant] failed to stop contacting her." It made written findings Appellant had "abused and stalked" K.E.S. and posed a "serious danger to [her] physical or mental health." The order of protection prohibited Appellant from (1) communicating with K.E.S. in any manner, including through third parties, (2) committing or threatening to commit domestic violence, molesting, stalking, sexual assault, or disturbing the peace of K.E.S., (3) abusing or threatening to abuse her pets, and (4) from coming within 1,000 feet of her. K.E.S. has not heard directly from Appellant since the entry of her *ex parte* order. This appeal follows.

**Standard of Review**

"In an appeal from a court-tried civil case, [this Court's] review is governed by *Murphy v. Carron*." *E.M.B. v. A.L.*, 462 S.W.3d 450, 452 (Mo. App. E.D. 2015). "In reviewing … full orders of protection, this Court will sustain the judgment of the trial court unless there is no evidence to support it, it is against the weight of the evidence, or it erroneously declares or applies the law." *L.M.M. v. J.L.G.*, 619 S.W.3d 593, 596 (Mo. App. E.D. 2021). "[This Court] view[s] the facts and reasonable inferences in the light most favorable to the judgment." *Id.* "The reviewing court will defer to the trial court's determinations of witness credibility, as the trial court is in a superior position to assess credibility." *N.C. v. Y.Q.L.*, 609 S.W.3d 56, 58 (Mo. App. E.D. 2020). "Because

6

the trial judge is in the best position to gauge the credibility of the witnesses, in cases under the Adult Abuse Act, the discretion of the trial court should not often be superseded." *K.M.C. v. M.W.M.*, 518 S.W.3d 273, 276–77 (Mo. App. E.D. 2017).

**Discussion**

*Point I: Sufficiency to Support Circuit Court Finding Appellant Poses a Serious Danger to*
*K.E.S.'s Mental or Physical Health*
*Party Positions*

In his sole point on appeal, Appellant argues the circuit court erred in entering a full order of protection for a ten-year term under § 455.040.1(4) because there was insufficient evidence to extend the protective order's term when applying the statutory factors. He argues K.E.S. could not have been scared of him because she continued to go on dates with him. K.E.S. contends there was sufficient evidence to support the circuit court's judgment under the factors because her credible, unrebutted, and unimpeached testimony demonstrated Appellant poses a serious danger to her physical or mental health.

*Analysis*

"The Missouri Adult Abuse Act provides that any adult may seek an order of protection by filing a verified petition alleging domestic violence, stalking, or sexual assault." *L.M.M.*, 619 S.W.3d 593 at 596. When originally enacted, the maximum term for a full order of protection was one year. *S.A.B. v. J.L.R.*, 675 S.W.3d 245, 256 (Mo. App. E.D. 2023). The Legislature amended the statute in 2021 to allow for an extension of the term for up to ten years if a court made "specific written findings" the respondent poses a "serious danger to the physical or mental health of the petitioner." § 455.040.1(1); *see also L.E.C. v. K.R.C.*, 674 S.W.3d 97, 107 n.10 (Mo. App. E.D. 2023).[3] In determining if a respondent poses a serious danger to the physical or mental health of

---

[3] Respondent, in this context, refers to the respondent named in the original order of protection petition.

the petitioner, § 455.040.1(4) requires circuit courts to "consider all relevant evidence including, but not limited to:

(a) The weight of the evidence;

(b) The respondent's history of inflicting or causing physical harm, bodily injury, or assault;

(c) The respondent's history of stalking or causing fear of physical harm, bodily injury, or assault on the petitioner or a minor household member of the petitioner;

(d) The respondent's criminal record;

(e) Whether any prior full orders of adult or child protection have been issued against the respondent;

(f) Whether the respondent has been found guilty of any dangerous felony under Missouri law; and

(g) Whether the respondent violated any term or terms of probation or parole or violated any term of a prior full or temporary order of protection and which violated terms were intended to protect the petitioner or a minor household member of the petitioner."

§ 455.040.1(4)(a)-(g).

Because no other appellate court has yet analyzed § 455.040.1(4), this Court must engage in statutory interpretation. "This Court's primary rule of statutory interpretation is to give effect to legislative intent as reflected in the plain language of the statute at issue." *Parktown Imports, Inc. v. Audi of Am., Inc.*, 278 S.W.3d 670, 672 (Mo. banc 2009). "[T]his Court presumes every word, sentence, or clause in a statute has effect, and the legislature did not insert superfluous language." *Dubuc v. Treasurer of State*, 659 S.W.3d 596, 603 (Mo. banc 2023) (quoting *Swafford v. Treasurer of Mo.*, 659 S.W.3d 580, 583 (Mo. banc 2023)) (internal quotations omitted).

Section 455.040.1(4) is a factor test, not an element test. The Legislature stated "including, but not limited to" before listing the seven factors to consider in making the "serious danger" determination. § 455.040.1(4). When the Legislature has used similar or identical language before

a list of statutory factors in other contexts, courts have deemed the list non-exclusive. *See Sutton v. McCollum*, 421 S.W.3d 477, 483 (Mo. App. S.D. 2013) (characterizing § 452.375.2, which states, "[w]hen the parties have not reached an agreement on all issues related to custody, the court shall consider *all relevant factors* and enter written findings of fact and conclusions of law, *including, but not limited to*, the following" as providing non-exclusive factors) (emphasis added); *R. S. v. Dunklin Cnty. Juv. Off.*, 685 S.W.3d 600, 606 (Mo. App. S.D. 2024) (stating § 211.071.6's "criteria [for certification of juvenile as adult] *shall include but be not limited to*" is a list of non-exhaustive factors) (emphasis added). Similarly, this Court holds § 455.040.1(4)'s list of factors is non-exhaustive.[4]

As with other non-exhaustive factor determinations, "the trial court need not give greater weight to certain factors than others." *Sutton*, 421 S.W.3d at 483; *see also R. S.*, 685 S.W.3d at 606. There is no specific formula for weighing the statutory list. *Sutton*, 421 S.W.3d at 483; *R. S.*, 685 S.W.3d at 606. The circuit court is entitled to significant discretion when weighing the factors. *See R. S.*, 685 S.W.3d at 606.

Appellant concedes there was sufficient evidence for the circuit court to enter a full order of protection against him for stalking and abusing K.E.S. There is a "potential stigma that may attach to an individual who is labelled a 'stalker' under the Missouri Adult Abuse Act." *J.R.C. v. S.L.F.*, 686 S.W.3d 673, 678 (Mo. App. E.D. 2024) (quoting *K.L.M. v. B.A.G.,* 532 S.W.3d 706, 709 (Mo. App. E.D. 2017)). Appellant cannot now contest the stigma that will arise from this determination because he has conceded he is a stalker. The only issue before this Court is whether there was sufficient evidence to find Appellant poses a serious danger to K.E.S.'s physical or

---

[4] Appellant agreed at oral argument the statute lists factors, not elements.

mental health to enter a full order of protection beyond one year. This Court will discuss each factor.

*(a) Weight of the Evidence*

The first factor is the weight of the evidence. "'Weight' means the probative value of evidence, not the quantity." *Day v. Hupp*, 528 S.W.3d 400, 411 (Mo. App. E.D. 2017). "The weight of the evidence is not determined by mathematics, but on its effect in inducing belief." *Houston v. Crider*, 317 S.W.3d 178, 186 (Mo. App. S.D. 2010). "A contention that a necessary proposition is against the weight of the evidence challenges the probative value of that evidence to induce belief in the disputed proposition when viewed in the context of the entirety of the evidence before the trier of fact." *Day*, 528 S.W.3d at 411. "[A]n against-the-weight-of-the-evidence challenge requires completion of four sequential steps:

> (1) identify a challenged factual proposition, the existence of which is necessary to sustain the judgment;
>
> (2) identify all of the favorable evidence in the record supporting the existence of that proposition;
>
> (3) identify the evidence in the record contrary to the belief of that proposition, resolving all conflicts in testimony in accordance with the trial court's credibility determinations, whether explicit or implicit; and,
>
> (4) demonstrate why the favorable evidence, along with the reasonable inferences drawn from that evidence, is so lacking in probative value, when considered in the context of the totality of the evidence, that it fails to induce belief in that proposition."

*Houston*, 317 S.W.3d at 187.

"[A] failure to fully identify and develop the evidence favorable to the finding … necessarily undermines the[] ability to demonstrate how that favorable evidence did not have probative force upon the issue … such that the trier of fact could not reasonably decide its existence[.]" *Id.* at 188.

10

> "To support a favorable decision for [Appellant] on this point would require this Court to devise and articulate its own demonstration of how the omitted favorable evidence … [is] against the weight of the evidence. Such action on our part would thrust us into becoming an advocate on [Appellant's] behalf; a role we are prohibited from assuming."

*Id.* at 189.

First, Appellant identifies the challenged factual proposition he poses a "serious danger to the physical and mental health" of K.E.S. This proposition is necessary to the judgment because, without this factual finding, the circuit court could not have imposed the ten-year term. Second, Appellant cites no facts favorable to the circuit court's judgment in his point relied on and argument section. Instead, he makes only slanted references which reduce, minimize, and omit material facts supporting the seriousness of his actions.

In Appellant's retelling of the April 14th encounter, he merely "damaged [K.E.S.]'s property by putting a hole in [her] bedroom door." The event was much more severe than his version makes it seem. Before arriving at K.E.S.'s house, Appellant had called her "crazy," "a psycho," "stupid fucking bitch," and a "stupid fucking cunt." Appellant did not just "put[] a hole in [K.E.S.'s] bedroom door." He ran down K.E.S.'s hallway and banged on her six-panel door so violently he punched a hole in it and knocked it off its hinges.

In Appellant's retelling of the July 11th incident, he just "called [K.E.S.] vulgar names," "refus[ed] to leave her home" and eventually "left [K.E.S.]'s home" with "[n]othing physical occur[ing]." The record refutes "nothing physical" occurred on this day because Appellant: (1) barged headfirst through her screen door, pushing her back, (2) snatched her purse off her arm, (3) restrained her on his lap, and (4) slapped her behind. The circuit court cited this incident to find Appellant assaulted K.E.S. under § 455.010(1)(b).[5]

---

[5] The Adult Abuse Act defines "assault" as "purposely or knowingly placing or attempting to place another in fear of physical harm." § 455.010(1)(b).

Appellant described the events of July 12th and 13th as merely an "incident in which Appellant got physical with [K.E.S.] and she broke up with [him]." Again, K.E.S.'s credible testimony refutes Appellant's characterization of this incident. While Appellant drove K.E.S. home, he berated her with epithets. When K.E.S. announced she was breaking up with him, Appellant left her on the side of the road to walk the two-and-a-half or three miles home. When she arrived home, K.E.S. found him somehow in her house and naked in her bed. She put his clothes on the hood of his car and ran back to her house. Appellant ran outside, picked up his clothes and—before she could close the door —slammed her headfirst through it. Appellant then threw her to the floor, picked her up, and threw her against the TV stand and coffee table. He put her in a headlock on the floor. K.E.S. only escaped because she kicked her legs out and stumbled through the front door. Nowhere in Appellant's point relied on and argument section is any mention Appellant had increased his steroid dosage beyond his prescribed level. Nowhere in those sections does Appellant acknowledge he blamed the physical assaults on his steroid increase.

Appellant likewise minimizes the events of July 28th as a "verbal altercation" because he showed up "to [K.E.S.]'s house uninvited." Again, Appellant omits several key facts from this encounter: (1) K.E.S. locked her doors, (2) turned off the lights, and (3) sat in her dark hallway so Appellant would leave. Appellant does not mention he made his way into K.E.S.'s gated backyard and peered into her bedroom window. He overlooks the fact he climbed her deck stairs and attempted to break into the house.

Also absent from Appellant's analysis is his callous use of his five-year-old twins. Because Appellant had had two miscarriages, he told her his twins could be her "new children." When Appellant began to see K.E.S. more sporadically after the physical assault, he used his children to convince her to see him again. He would, for example, send K.E.S. videos of his children crying

12

because they missed her and her son. On September 23rd, his twins curiously changed their minds about a public bowling outing for a private movie session. On September 24th, after K.E.S. told Appellant he was not welcome at her son's birthday party, he sent her a video of his young twins wishing her son a happy birthday.

These facts, taken together, form favorable evidence supporting the existence of the proposition Appellant poses a serious danger to K.E.S.'s physical or mental health. Appellant's failure to identify favorable evidence is fatal to his weight of the evidence claim in step four. *Houston*, 317 S.W.3d at 188.

Third, Appellant marshals a few pieces of evidence contrary to the belief he poses a serious danger to K.E.S.'s physical or mental health. Appellant notes K.E.S. frequently would block and unblock Appellant's phone number. He also contends that despite testifying numerous times she was scared of Appellant, K.E.S. continued to date him. He notes K.E.S. never once called the police on him. Appellant posits K.E.S. could not have been scared of him because she continued to voluntarily see him.

Fourth, Appellant concedes his name calling was "unacceptable" and his pursuit of K.E.S. was "aggressive at times." Still, he argues, his "unacceptable" and "aggressive" behavior lacks probative value to support the circuit court's judgment because it was "reciprocated by [K.E.S.]" throughout the relationship as she was willing to "see and go on dates with" him. Except for the July 12th incident, Appellant claims there were "no physical altercations."

Appellant paints an incomplete picture of his and K.E.S.'s relationship and engages in victim blaming. Section 455.040 protects all victims who can prove by a preponderance of the evidence they endured domestic violence, stalking, or sexual assault. *L.M.M.*, 619 S.W.3d at 596. A person does not forfeit the law's protections just because they failed to immediately cease all

communications with their abuser and engage the legal system. *See Parkhurst v. Parkhurst*, 793 S.W.2d 634, 636 (Mo. App. E.D. 1990) (granting an order of protection to a person who had last been abused two-and-a-half months before the filing of the petition). Merely showing K.E.S. did not respond to Appellant's abuse as he deemed proper does not demonstrate why the overwhelming favorable evidence to support the circuit court's judgment fails to induce a belief Appellant poses a serious danger to K.E.S.'s physical or mental health.

Appellant's analysis also omits evidence his own actions prevented K.E.S. from calling the police. She credibly testified he threatened to "blow up" her life with her ex-husband, to use his legal connections to avoid criminal charges (as he had in the past), and to call her employer.  In addition, as the circuit court found, K.E.S. took reasonable steps in her handling of the relationship given her understanding of the law. After the physical assault, she met Appellant only in public or with his kids. Once she learned about the assault charge against Appellant in Arnold Municipal Court, she felt empowered by the legal system. She never again saw Appellant in person. She wanted to end the relationship without obtaining an order of protection, but Appellant's incessant and unwanted contact forced her hand. It would be unfair for Appellant to benefit from her hesitancy to engage the legal system when he caused her trepidation.

Appellant's against the weight challenge fails because he neglected to identify the favorable evidence in the record supporting the existence of the proposition he poses a serious danger to K.E.S.'s physical or mental health. This Court cannot determine why a proposition lacks probative value if the party does not fully identify all favorable evidence supporting that proposition. *Houston*, 317 S.W.3d at 188–89. To hold otherwise would require this Court to act as an advocate for Appellant to demonstrate why the omitted favorable evidence is against the weight of the evidence.  Sound logic and solidified case law forbid this. *Murphree v. Lakeshore Estates,*

*LLC*, 636 S.W.3d 622, 626 (Mo. App. E.D. 2021). These omissions of material favorable evidence doom Appellant's claim. *See Houston,* 317 S.W.3d at 188.

Because the circuit court's finding Appellant poses a serious danger to K.E.S.'s physical or mental health is not against the weight of the evidence, this factor weighs in favor of entry of the extended order of protection.

*(b) Appellant's History of Inflicting or Causing Physical Harm*

Appellant argues there was no evidence to support this factor aside from K.E.S.'s testimony she learned of Appellant's "prior assault charge" from 2005. Since K.E.S. did not provide a certified copy of this conviction, Appellant argues there was no history of his inflicting or causing physical harm presented at trial. This argument mischaracterizes the evidence.

"[I]f accepted as true by the fact trier, the testimony of a single witness is sufficient to establish any fact …." *Guengerich v. Barker*, 423 S.W.3d 331, 341 (Mo. App. S.D. 2014) (quoting *McClelland v. Williamson*, 627 S.W.2d 94, 98 (Mo. App. S.D. 1982)). K.E.S. testified Appellant told her he had *pled guilty* to an assault case arising from rape and assault allegations—not just that he was charged. Because Appellant offered no rebuttal testimony on this point, and because the circuit court found K.E.S. credible, her testimony sufficiently establishes Appellant assaulted a woman in 2005.

Because Appellant has a history of inflicting or causing physical harm, this factor weighs in favor of entry of the extended order of protection.

*(c) Appellant's History of Stalking or Causing Fear of Physical Harm, Bodily Injury,*
*or Assault on K.E.S.*

Appellant argues this factor weighs in his favor because the relationship lasted only nine months, he did not contact K.E.S. after she sought an order of protection, there was only one

15

physical incident between them, and only one incident of assault under § 455.040. Because K.E.S. continued to see him, Appellant posits she could not have feared physical harm from him.

Appellant's analysis again minimizes material facts in the record. Appellant concedes there was sufficient evidence to support the circuit court's entry of a full order of protection against him. The circuit court found Appellant committed all four acts this factor identifies: stalking, causing fear of physical harm, bodily injury, and assault. It found he stalked K.E.S. under § 455.040 when he broke her bedroom door on April 14th, physically restrained her on July 11th, physically assaulted her on July 13th, and peered into her windows on July 28th. It also found his incessant text messages, especially after K.E.S. told him to stop contacting her, were unwanted and constituted stalking.[6] The circuit court used those same incidents to prove Appellant caused K.E.S. to fear physical harm from him. The July 13th incident—when Appellant rammed K.E.S. headfirst through her door, threw her around her living room, and put her in a headlock—is sufficient to prove bodily injury.[7] Finally, the circuit court found Appellant assaulted K.E.S. under § 455.040 because of the events of April 14th, July 11th, July 13th, and July 28th, as discussed previously. Appellant does not challenge the sufficiency of the evidence to support these findings.

Because Appellant had a history of stalking, causing fear of physical harm, bodily injury, and assault on K.E.S., this factor weighs in favor of the entry of the extended order of protection.

*(d) Criminal Record*

Appellant argues because K.E.S. did not produce certified copies of his criminal record at the hearing, there was no evidence of this factor for the circuit court to consider. K.E.S. contends

---

[6] Section 455.010(15) defines "stalking" as "when any person purposely engages in an unwanted course of conduct that causes alarm to another person ... when it is reasonable in that person's situation to have been alarmed by the conduct." "Alarm" means "to cause fear of danger of physical harm." § 455.010(15)(a). "Course of conduct" means "two or more acts that serve no legitimate purpose including, but not limited to, acts in which the stalker directly, indirectly, or through a third party follows, monitors, observes, surveils, threatens, or communicates to a person by any action, method, or device." § 455.010(15)(b).

[7] "Battery" is "purposely or knowingly causing physical harm to another ...." § 455.010(1)(c).

16

a screenshot of Case.net, her testimony, and the circuit court's judicial notice of the Arnold municipal case are adequate to support this factor.

Because this Court presumes "every clause in a statute has effect, and the legislature did not insert superfluous language," each factor must have an independent meaning. *See Dubuc*, 659 S.W.3d at 603 (quoting *Swafford*, 659 S.W.3d at 583). Because this Court must give every clause effect, it follows "criminal history" and "criminal record" must be afforded different meanings. The statute does not define "criminal record." Webster's Third defines "record" as "(2) something that serves to record, as: … (4) : an official contemporaneous memorandum stating the proceedings of a court of justice (5) : an official copy of the legal papers used in a case and of memoranda of the proceedings of the court." WEBSTER'S THIRD NEW INT'L DICTIONARY 1898 (2002). For purposes of § 455.040.1(4)(d), "criminal record" means official documentation of legal proceedings. These legal proceedings encompass the entire range of citizen contact with the justice system from arrest to conviction to release. § 610.140.2 ("any person may apply to any court in which such person was charged or found guilty of any offenses, violations, or infractions for an order to expunge *records* of such arrest, plea, trial, or conviction.") (emphasis added); *see also* 11 C.S.R. § 30-4.010(3) (defining criminal history record information as "identifiable descriptions and notations of arrests, detentions, indictments, information or other formal criminal charges and any disposition arising from criminal charges, sentencing, correctional supervision and release.").

K.E.S. provided a Case.net screenshot of a 10-count charge for assault, rape, and sodomy in St. Charles County. "Case.net is not an official record." *Johnson v. McCullough*, 306 S.W.3d 551, 559 n.4 (Mo. banc 2010). Because Case.net is not an official record, it cannot be relied upon to prove Appellant's criminal record. Likewise, K.E.S.'s testimony regarding Appellant's 2005

plea and the St. Charles County case provide no official documentation of legal proceedings. They are not considered part of his criminal record under § 455.040.1(4)(d).

Taking judicial notice of official documentation of legal proceedings is permissible to prove a criminal record. Here, the circuit court took judicial notice of the charges pending against Appellant in Arnold Municipal Court. "Courts may take judicial notice of other proceedings when the cases are interwoven or interdependent." *Branch v. State*, 531 S.W.3d 621, 624 (Mo. App. E.D. 2017) (quoting *Envtl. Utilities, LLC v. Pub. Serv. Comm'n*, 219 S.W.3d 256, 265 (Mo. App. W.D. 2007)). Two cases involving (1) the same perpetrator(s) and victim(s), and (2) related factual scenarios are interwoven or interdependent. *State v. Flores*, 437 S.W.3d 779, 787 n.7 (Mo. App. W.D. 2014) (holding appellate court could take judicial notice of former codefendant's severed case); *see also State v. Weber*, 814 S.W.2d 298, 303–04 (Mo. App. E.D. 1991) (holding circuit court could take judicial notice of protective order filed in subsequent criminal prosecution for burglary).

Here, the Arnold municipal case involved (1) the same perpetrator and victim (Appellant and K.E.S.) and (2) a related factual scenario (the July 13th assault) as the order of protection case. Thus, the circuit court properly took judicial notice of the Arnold municipal case to which Appellant offered no objection at trial. By taking judicial notice of the Arnold municipal case (and its official documentation of legal proceedings), K.E.S. proved Appellant had a criminal record.

Finally, certified copies are not required under § 455.040.1(4)(d) to prove a criminal record. The statute calls for analysis of Appellant's "criminal record," not a "certified criminal record." § 455.040.1(4)(d). Appellant is trying to insert a word into the statute that is simply not present.

Because the circuit court had evidence before it regarding Appellant's criminal record, this factor weighs in favor of the entry of an extended order of protection.

*(e) Whether Any Full Orders of Adult or Child Protection Have Been Issued Against Appellant*

Both parties agree there was no evidence presented as to whether any full orders of adult or child protection have been issued against Appellant. This factor does not weigh in favor of the entry of the extended order of protection.

*(f) Whether Appellant Has Been Found Guilty of Any Dangerous Felony Under Missouri Law*

Both parties agree there was no evidence presented as to whether Appellant has been found guilty of any dangerous felony under Missouri law. This factor does not weigh in favor of the entry of the extended order of protection.

*(g) Whether Appellant Has Violated His Probation, Parole, or* Ex Parte *or Full Order of Protection Intended to Protect K.E.S.*

Appellant argues he has never violated any term of probation, parole, or *ex parte* or full order of protection intended to protect K.E.S. K.E.S. counters he violated her *ex parte* order of protection twice.

First, K.E.S. contends, for the first time on appeal, Appellant disseminated private sexual photograph(s) and/or video(s) of her days after he was served with the *ex parte* order of protection. K.E.S. concedes evidence for this claim is not in the record below. She argues it would nonetheless be unfair not to consider her claim because she did not learn of the dissemination until after the hearing. It would have been impossible for her to have testified to something she knew nothing about. K.E.S. cites no legal authority justifying an exception to this Court's general rule it "will not consider evidence outside the record on appeal." *Day*, 528 S.W.3d at 412. K.E.S. alternatively argues because Appellant omitted this information in his brief when arguing he never violated the order of protection, he "opened the door" to correcting this omission. This argument presents a rule of evidence. *Sherrer v. Boston Sci. Corp.*, 609 S.W.3d 697, 708 (Mo. banc 2020). This rule of

19

evidence, however, is not an exception to this Court's general rule. *Day*, 528 S.W.3d at 412. Because the evidence of Appellant's alleged dissemination was outside of the record on appeal, this Court declines to consider the argument.

Second, K.E.S. testified Appellant had his "attorney friend" contact her when he was served with the *ex parte* order of protection. K.E.S. argues this contact violated the order of protection's prohibition on third-party contact. This Court need not decide this question. Even assuming this third-party contact did not result in Appellant violating the order of protection, this Court holds factors (a) through (d) provided sufficient evidence Appellant poses a serious danger to K.E.S.'s physical or mental health.

For these reasons, the circuit court appropriately applied the factors in § 455.040.1(4)(a)-(g). The circuit court did not err in finding Appellant poses a serious danger to K.E.S.'s physical or mental health. The ten-year term for the order of protection is supported by sufficient evidence. Point I is denied.

### Conclusion

The circuit court's judgment is affirmed.

_____
Philip M. Hess, Presiding Judge

Gary M. Gaertner, Jr., J. and
Renée Hardin-Tammons, J. concur.

20